667 P.2d 191

**STATE of Arizona, Appellee,**

v.

**Juan Garcia MONTES, Appellant.**

No. 5598.

Supreme Court of Arizona,
En Banc.

June 17, 1983.
Rehearing Denied July 19, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee.

Glynn W. Gilcrease, Jr., Tempe, for appellant.

HAYS, Justice.

Juan Montes was tried and convicted of first degree felony murder, A.R.S. § 13–1105(A)(2) and armed robbery, A.R.S. § 13–1904. He was sentenced to life imprisonment on the murder charge and to fourteen years for the robbery. We have jurisdiction of the appeal pursuant to the Arizona Constitution, article .6, § 5 and A.R.S. § 13–4031.

In the Tivoli bar in downtown Phoenix on May 22, 1981, Montes and two companions, Bobby Saylor and Antonio Sapien, met their victim, Alfred Romero. Romero agreed to give the three men a ride home if they would purchase gasoline for his car. The events which then transpired are taken from appellant's testimony at trial and from his confession admitted into evidence. After a few deviations, the men eventually arrived in the area of 48th Avenue and Elliott. Sapien pulled a knife and forced Romero to drive off the road. Sapien and

Saylor took Romero's wallet, tied him up and pulled his pants down, then stabbed and mutilated his body using knives and rocks. The three men drove off in Romero's car, leaving the victim in the desert where his body was later found by horseback-riders. Money taken from Romero's wallet was used to purchase gasoline for the car and to buy more beer. Two days later, appellant was driving the victim's vehicle with Sapien as passenger when he was involved in a wreck; appellant fled the scene of the accident. Five and one-half months later, appellant was located in the Winslow city jail where he was being held on an unrelated charge.

Appellant's defense at trial was that he did not plan or participate in the crimes, and that when he tried to stop his friends, he was told to be quiet. He testified that he was ordered to drive the car away from the scene with the headlights out and that for the days following, Sapien would not let him out of his sight.

## I. MIRANDA ISSUE

### A. *Interrogation*

Appellant raises the question whether the detective investigating the matter failed to timely advise him of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant was in the Winslow city jail on an unrelated charge when first interviewed by Detective Dominguez. The detective introduced himself to Montes as the policeman assigned to investigate the Romero homicide, told Montes that a codefendant, Bobby Saylor, had been arrested in connection with the murder, and that a third subject, Sinaloa, had also been identified. The detective informed Montes that Bobby Saylor had made a statement implicating Montes in the crime. He next showed Montes a photograph of the victim's vehicle. Montes identified the vehicle as the victim's and stated he had driven the vehicle but didn't know anything about the murder. It was only then, after appellant had made this incriminating statement, that the detective advised Montes of his *Miranda* rights using the standard rights card issued by the department in English and Spanish translation. The trial court refused to suppress Montes' statement made in response to Detective Dominguez' words and actions, finding that "there was no force, there were no threats, there was [sic] no promises of immunity or otherwise, and that *Miranda* rights were read to Defendant before any questions were asked." We do not agree.

In *Miranda v. Arizona, supra,* the Court held that statements stemming from custodial interrogation of the defendant cannot be used against him unless the state demonstrates that the accused was advised of and waived his fifth and sixth amendment rights. The Court was careful to point out, however, that any volunteered statements, not prompted by interrogation, are admissible against the accused. "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to police without the benefit of warning and counsel, but whether he can be interrogated." *Id.* at 478, 86 S.Ct. at 1630. Our threshold inquiry, then, is whether the statement elicited from appellant occurred during "custodial interrogation." For purposes of the *Miranda* requirements, it does not matter that appellant was in custody for an unrelated offense. *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). The critical issue is whether appellant was subjected to an interrogation before *Miranda* warnings were given.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court defined "interrogation" as referring "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only

to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301–02, 100 S.Ct. at 1690.

Already in custody, Montes was brought into a room in the jailhouse to meet with Detective Dominguez. Without giving him any warnings, the detective confronted Montes with evidence which implicated him in the crime, then showed him a picture of the vehicle. Detective Dominguez should have known that such words and actions are reasonably likely to evoke an incriminating response from the suspect. The state characterizes the pre-warning words and actions of the detective as "introductory," made so that the appellant would know what the interview concerned, and argues that the issue is voluntariness, not *Miranda*. We find that the detective's words and actions go far beyond "those normally attendant to arrest and custody" and that *Miranda* warnings should have been given before the detective confronted appellant with the evidence.

Voluntariness and *Miranda* are two separate inquiries. "[T]he necessity of giving *Miranda* warnings to a suspect relates not to the voluntariness of a confession but to its admissibility." *State v. Morse,* 127 Ariz. 25, 29, 617 P.2d 1141, 1145 (1980). Unless law enforcement officers advise a defendant in custody of the *Miranda* rights before questioning him, any statement made by that person in custody is inadmissible against him at trial "even though the statement may in fact be wholly voluntary." *Michigan v. Moseley,* 423 U.S. 96, 100, 96 S.Ct. 321, 325, 46 L.Ed.2d 313, 319 (1975). We hold that the detective's words and actions constituted interrogation and that the subsequent statement was taken in violation of *Miranda.* The trial court erred in not suppressing that statement. A discussion of the effect of this error will follow in a later portion of this opinion.

Immediately after Montes identified the victim's vehicle, Detective Dominguez advised him of his *Miranda* rights in Spanish using the standard card issued by the department. The detective asked Montes to sign the card, telling him it was his option to sign and was not an admission of guilt. Appellant refused to sign the card, then gave a taped statement to the detective. Appellant asserts that this confession should have been suppressed for two reasons: (1) it was obtained in violation of *Miranda v. Arizona, supra,* and (2) it was involuntary.

**B.** *Waiver*

Appellant contends that he invoked his right to remain silent by refusing to sign the rights card and that the detective did not honor this right. At the voluntariness hearing, the detective testified as follows:

A. It's a standard rights card. The *Miranda* warnings offered in English and Spanish, and it has my name and serial number affixed to it and the time and the date, and I wrote on there "He refused."

Q. What does that refer to?

A. That the subject refused to sign the rights card, indicating that I had written—excuse me, that I had read those rights to him on that card.

Q. All right. Let's talk about this refusal. Did you tell him to sign the card?

A. No.

Q. What did you tell him?

A. I told him that it was an option. He didn't have to sign it. It was not an admission of guilt.

I wanted to indicate to the Court, later, or to anyone who wanted to see the card, that I did actually read from this particular card.

Q. Did he indicate to you at the time that he refused to sign it that he had any question about his rights?

A. No.

Q. Did he indicate to you, verbally, that he understood his rights?

A. Yes, he did.

Q. In Spanish?

A. Yes, he had. [sic]

Q. Did he indicate to you why he didn't want to sign the card?

A. No, he didn't.

Q. But you specifically recall him indicating to you, verbally, that he understood his rights?

A. Yes.

Q. And, then, did he go on and answer your questions?

A. Yes, he did.

Q. Did there ever come a time in the questioning when he asked that the questioning cease or that he be allowed to see or speak with an attorney?

A. No.

Appellant does not contest the detective's version of the interview, but argues that his refusal to sign the rights card was an assertion of his right to remain silent and that, at that point, all interrogation should have ceased. We must undertake to determine whether Montes understood his right to remain silent and his right to counsel and whether he intelligently and knowingly relinquished those rights. This determination focuses on the particular facts and circumstances surrounding a case, including the defendant's background, experience and conduct. *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979).

In *North Carolina v. Butler, supra,* the United States Supreme Court held that a court may find an intelligent and understanding waiver in situations where the defendant does not expressly state as much. The defendant in that case stated that he understood his *Miranda* rights and would talk to the detective, but refused to sign the waiver at the bottom of the form. The North Carolina Supreme Court interpreted *Miranda* to prohibit per se the use of any custodial statement unless, at the time the statement was made, the defendant explicitly waived his right to counsel and to an attorney. The United States Supreme Court rejected this per se rule.

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda,* mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

*Id.* at 373, 99 S.Ct. at 1757. The Court then held that although he had refused to sign the card, the defendant had waived his rights because he answered the detective's questions freely and at no time did he request counsel or attempt to terminate the agent's questioning. The Court also expressly approved two Arizona cases wherein we held that an explicit statement of waiver is not invariably necessary to support a finding that defendant waived his right to remain silent. *Id.* at 375 n. 6, 99 S.Ct. at 1758. We have stated: "[A]nswering questions, after the giving of a proper warning of constitutional rights, constitutes a waiver by conduct." *State v. Pineda,* 110 Ariz. 342, 345, 519 P.2d 41, 44 (1974).

The fact, then, that Montes refused to sign the rights card is not determinative. Looking at the facts and circumstances surrounding the case, we conclude that Montes knowingly and intelligently waived his right to remain silent. Montes is a Mexican national, with only a third-grade education and little command of the English language. However, the record shows that Detective Dominguez is fluent in Spanish and that he conducted the entire interview in Spanish, including the giving of *Miranda* rights. Montes' prior criminal record demonstrates that he was not unfamiliar with the criminal process. It is uncontroverted that Montes was fully and properly advised of his rights and that he indicated he understood them. Montes freely answered all the

questions put to him, he never asked for counsel nor did he attempt to terminate the agent's questioning. The interview lasted but a short period and there is no evidence that Montes was threatened or abused. When Detective Dominguez asked Montes if he could tape the interview, Montes acquiesced and again indicated that he understood his rights:

Q. And at the time that you began taping, did you ask him if he wanted to be taped?

A. Yes.

Q. And did he agree to that?

A. Yes. He said, "No problems."

Q. And was there any time in this conversation that you were taping when he ever indicated to you that he didn't want to go on, that he wanted to stop the interview, something like that?

A. No, sir.

Q. And was there ever a time throughout the entire conversation, both the taped conversation and the nontaped conversation, where the Defendant wished the interview to cease or where he asked for an attorney?

A. No, he didn't.

Q. And was the entire conversation in Spanish?

A. Yes, sir.

Again appellant does not contradict the detective's version of the events nor does he present any evidence that he did not wish to discuss the matter with the detective. We conclude that Montes understood his right to remain silent and his right to counsel and that he knowingly and intelligently relinquished those rights.

C. *Voluntariness of the Confession*

Appellant contends the confession made after he was given his *Miranda* warnings was tainted by the statement he made prior to the warnings, and therefore involuntary. He cites *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which holds that a confession is not rendered voluntary by the mere fact an accused has been advised of his *Miranda* rights.

Confessions are prima facie involuntary and the state must show by a preponderance of the evidence that the confession was freely and voluntarily made. Courts must look to the totality of the circumstances surrounding the giving of the confession to determine whether the state has met its burden; absent clear and manifest error, that ruling will not be overturned on appeal. *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983).

In *Westover v. United States, supra,* a confession given by defendant after proper *Miranda* warnings was found inadmissible because the interrogation of the defendant by the FBI immediately followed a grueling fourteen-hour interrogation by local authorities. The Court ruled that, under those circumstances, it was impossible for the accused to make a knowing and intelligent waiver of his rights. This rule, however, is not inflexible. Where the sole illegality is the failure to give *Miranda* warnings, and circumstances indicate that the subsequent confession was given after proper warnings and is otherwise voluntary, the subsequent confession is admissible. *United States v. Toral*, 536 F.2d 893 (9th Cir.1976).

Appellant's initial statement was rendered inadmissible exclusively because of the failure of the police to advise him of his *Miranda* rights. In that statement, appellant identified the victim's vehicle and denied knowledge of any murder, then was immediately advised of his rights. It is reasonable to conclude that he did not then feel compelled to tell the rest of his story. After being advised of his rights, he chose to talk. The record indicates nothing inherently coercive about the interview either before or after the warnings were given. The interview was not lengthy, and only the detective and appellant were present. There is no evidence that suggests that appellant's will was overborne, that he was physically or emotionally abused, or that the detective attempted to induce his con-

fession by promises or threats. We agree with the trial judge that the subsequent confession was voluntary and admissible.

### D. Harmless Error

Having concluded that Montes' initial pre-warning statement was unlawful for the sole reason it was obtained in violation of *Miranda v. Arizona, supra,* it remains for us to consider whether the admission of that statement into evidence requires reversal. Statements obtained without the benefit of *Miranda* warnings, unlawful but not involuntary, are subject to the harmless error rule. *Smith v. Estelle,* 527 F.2d 430 (5th Cir.1976). A constitutional error is harmless if it can be said beyond a reasonable doubt that the error had no influence on the verdict of the jury. The question is whether the appellate court can say beyond a reasonable doubt that the jury would have found the defendant guilty without the evidence. *State v. Thomas,* 133 Ariz. 533, 538, 652 P.2d 1380, 1385 (1982); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We conclude beyond a reasonable doubt that the admission of Montes' statement identifying the victim's vehicle did not contribute to the jury's verdict. Montes' subsequent statement which was properly admitted into evidence recounts in detail the events surrounding the robbery and murder of the victim and renders innocuous the initial statement.

### II. ARIZONA'S FELONY MURDER RULE

Appellant urges us to reexamine the constitutionality of Arizona's felony-murder doctrine in light of *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and focuses his challenge on the state's authority to impose a sentence of life imprisonment. Montes contends the sentence is unconstitutionally disproportionate to his crime of armed robbery and violative of the eighth and fourteenth amendments to the United States Constitution because, the evidence showed that he took no part in the killing, had no intention that

the killing take place and that he even attempted to talk the actual killer out of committing the murder.

In two recent cases we discussed the impact of *Enmund v. Florida supra,* on Arizona's sentencing scheme. In *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983), we noted that *Enmund* was a reflection of society's sentiment that death is a disproportionate punishment for a defendant who neither killed, attempted to kill or intended to kill the victim. In *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983), we held that *Enmund* requires the trial judge, in capital punishment cases, to determine beyond a reasonable doubt the existence of one of those three factors prior to imposing a sentence of death. In neither case did we consider whether the rationale of *Enmund* extends to life imprisonment cases. We think it clear that it does not.

The unique nature of the death penalty has been emphasized time and again by the United States Supreme Court in applying the prohibition against cruel and unusual punishment.

> "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity."

*Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382, 389 (1980), *quoting from Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346, 388 (1972). As the *Rummel* court noted, the decisions applying the prohibition of the cruel and unusual punishment in capital cases are of limited assistance in deciding the constitutionality of a life sentence; successful challenges to the proportionality of sentences other than death are exceedingly rare.

In *Rummel v. Estelle, supra,* appellant challenged as grossly disproportionate his life sentence received under Texas' "recidi-

vist statute" which provides that a sentence of life is mandatory following a defendant's third felony conviction. The three felonies which mandated Rummel's life sentence were 1) the fraudulent use of a credit card to obtain $80 worth of goods and services, 2) passing a forged check for $28.36, and 3) obtaining $120.75 by false pretenses. Demonstrating a great reluctance to review legislatively mandated terms of imprisonment, the Court stated they "could draw a 'bright line' between the punishment of death and the various other permutations and commutations of punishments short of that ultimate sanction." *Id.* at 275, 100 S.Ct. at 1139. The Court concluded they will generally not intrude beyond that line into the province of the legislature whose duty it is to determine society's interest in deterring and punishing a particular criminal. The Court upheld Rummel's sentence of life imprisonment.

The United States Supreme Court expressly limits their decisions in capital cases to death penalty situations. When *Enmund v. Florida, supra,* is read in conjunction with *Rummel v. Estelle, supra,* and other cases, it becomes evident that the intent requirements of *Enmund* do not extend to life imprisonment cases. To do so would erode the very foundation of the felony-murder doctrine. Only recently we have declined to abolish the felony-murder rule, holding that the doctrine represents sound public policy, is reasonably related to the end sought to be accomplished and is constitutionally permissible. *State v. Celaya,* 135 Ariz. 248, 660 P.2d 849 (1983). We conclude that a sentence of life imprisonment is not unconstitutionally disproportionate to a conviction of first degree felony murder and we confine our holdings in *State v. McDaniel, supra,* and *State v. Gillies, supra,* to capital cases.

## III. PREJUDICIAL EVIDENCE

Appellant asks that all the evidence relating to the cause of death and the nature and extent of the victim's wounds be held inadmissible. The record reveals that the evidence of the events surrounding the victim's death included photographs of the deceased, the murder weapons and of the scene of the crime, two knives, a rock, diagrams of the area of the crime scene and the testimony of the pathologist. Two photographs depict the victim lying face down, his hands tied behind his back, pants pulled down around his knees, his buttocks bare. The pathologist testified as to the cause of death and described to the jury the extensive stab wounds, both internal and external, the incised wound in the scrotum, the partial evisceration of the testicles and the partial amputation of the penis. Most of these wounds are not visible in the photographs.

The state prosecuted Montes under a felony murder theory and the jury was charged on armed robbery, first degree felony murder, and, at the request of defense counsel, second degree murder. Appellant's defense was one of "mere presence" at the scene of the crime; Montes did not contest the fact of Romero's murder. He argued instead that he did not know his companions intended to rob the victim and that he urged them to leave the victim alone. It is uncontroverted that Montes did not kill the victim.

The determination by a trial court concerning the exclusion of evidence under rule 403, Rules of Evidence, 17A A.R.S., is within the sound discretion of the court and will not be disturbed on appeal without a clear showing of abuse of that discretion. *State v. Clark,* 126 Ariz. 428, 616 P.2d 888, *cert. denied,* 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). In *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983), we examined the admissibility of photographs and said that relevancy is not the sole test. "Where the offered exhibit is of the nature to incite passion or inflame the jury . . . the court must go beyond the question of relevancy and consider whether the probative value of the exhibit outweighs the danger of prejudice created by the admission of the exhibit." (citations omitted). *Id.* at 288, 660 P.2d at 1215. This determination requires that the purpose of the offer be examined. "[I]f the photographs have no

tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible." *Id.*

Rule 401, Rules of Evidence, 17A A.R.S., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Photographs may be relevant to illustrate how a crime was committed, to corroborate a witness' testimony, to aid the jury in understanding testimony, and to show the location of wounds and the cause of death. *State v. Clark, supra,* 126 Ariz. at 433, 616 P.2d at 893.

Appellant argues that the cause of death is irrelevant in a felony murder prosecution. We do not agree. The state had to prove that the appellant or another person caused Romero's death in furtherance of the armed robbery or in immediate flight therefrom. A.R.S. § 13–1105(A)(2). The cause of Romero's death was certainly relevant in proving this causal connection. We also find the contested evidence was relevant to second degree murder. Appellant testified that he did not participate in any of the acts and that he even tried to stop his companions. However, the state's witness testified that Montes later told him he (Montes) took a knife to the scene. This conduct, if believed by the jury, belies the defendant's innocent role. The evidence relating to the cause of Romero's death is relevant to the question of his intent or his knowledge of his companion's intent to commit second degree murder.

We have viewed the photographs and the other evidence and do not find them inflammatory. The record indicates that the parties sifted through numerous photographs to find the least gruesome available. The pictures of the victim were taken at a distance, show minimal blood and are not graphic. We find that the evidence of the cause of the victim's death was relevant and that its probative value outweighs any danger of prejudice created by its admission. The trial court did not err in admitting this evidence.

## IV. REMAINING ISSUES

Appellant raises two additional issues. He urges us to abolish our current rule that the results of a polygraph examination are inadmissible absent stipulation by the parties. We have considered his arguments and reaffirm that rule. *State v. Madsen,* 125 Ariz. 346, 609 P.2d 1046 (1980).

Appellant also contends that the trial judge abused his discretion in imposing a sentence of fourteen years for the armed robbery conviction. This sentence is to run concurrently with his sentence of life imprisonment without possibility of parole for twenty-five calendar years. The dangerous nature of the armed robbery was properly alleged and established. *State v. Tresize,* 127 Ariz. 571, 623 P.2d 1 (1980). The presumptive sentence for a class two felony involving the use of a dangerous weapon is 10½ years, with 21 years the maximum and 7 years the minimum. A.R.S. § 13–604(G). Perhaps the trial judge could have been more explicit in complying with the requirement of A.R.S. § 13–702(C) that the judge must set forth factual findings of aggravation and mitigation and reasons in support of such factual findings to increase a presumptive sentence. However, we have reviewed the evidence and do not find that the sentence is excessive.

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035 and find none.

The judgments of conviction and the sentences imposed are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.