685 P.2d 1293
**STATE of Arizona, Appellee,**

v.

**Steven Craig JAMES, Appellant.**

**No. 5744.**

Supreme Court of Arizona,
En Banc.

June 5, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Jack Roberts, Asst. Attys. Gen., Phoenix, for appellee.

Paul F. Lazarus, Phoenix, for appellant.

HAYS, Justice.

Appellant, Steven Craig James, was tried by jury and convicted of first degree murder, A.R.S. § 13–1105, and kidnapping, A.R.S. § 13–1304. He was found innocent on charges of aggravated robbery and theft. He was sentenced to death on the murder conviction and to twenty-one years imprisonment on the kidnapping conviction. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and 13–4035. The facts of this case are as set out in *State v. Libberton,* 141 Ariz. 132, 685 P.2d 1284 (1984). Additional facts will be discussed as necessary.

## RIGHT TO COUNSEL

James argues that his right to counsel was violated by the police. When James was arrested he was informed of the murder charge and of his rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). James said he understood his rights and he talked with a Detective Davis for approximately nineteen minutes in a small, windowless room. James does not allege that the statements he made during this interview were obtained in violation of his constitutional rights. The judge who presided over the voluntariness hearing, who was not the trial judge, found these statements to be voluntarily made, and we agree that these statements were taken in conformity with *Miranda, supra.* *See also State v. Montes,* 136 Ariz. 491, 667 P.2d 191 (1983).

■ At the nineteen-minute mark of the interview, James asked what would happen to him to which Davis responded "it's up to the courts." James then asked for an attorney. Instead of immediately ceasing the interrogation, *see Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (interrogation must cease when an accused asks for counsel), Davis told James he only wanted the facts and to give James an opportunity to tell his side of the story. James hesitated, said he did not need an attorney, then changed his mind and asked a second time for an attor-ney. Because James said nothing, he was not harmed.

When James asked for an attorney the second time, Davis, who was seated across from James, rose, turned, walked to the door and opened it. At that moment, Detective Midkiff arrived at the door. Midkiff faced Davis and asked: "Did he tell you where the body is?" There were two simultaneous responses: Davis said that James had asked for counsel; James volunteered that he would tell them where the body was located. James claims that his statement should have been suppressed and the fruits of that statement, the body, should have been suppressed also.

■ Incriminating statements are not admissible unless *Miranda* warnings are administered. *Montes, supra,* 136 Ariz. at 494, 667 P.2d at 194. If *Miranda* warnings were administered, the next requirement for admissibility is voluntariness. *Id.* at 495, 667 P.2d at 195. Because James asked for an attorney before he made this statement, *Edwards, supra,* and its progeny are controlling.

■ If an accused asks for counsel, he may not be interrogated unless counsel has been provided or the accused initiates the further discussion. *See Edwards, supra,* 451 U.S. at 484–85, 101 S.Ct. at 1885. Counsel was not provided for James and our inquiry focuses on the latter method of complying with *Edwards, supra.* In *Wyrick v. Fields,* 459 U.S. 42, 46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214 (1982), the Court said that "*Edwards* makes clear that the right to have a lawyer present can be waived ...." In *Oregon v. Bradshaw,* 462 U.S. 1039, ——, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983), Justice Rehnquist, speaking for the plurality consisting of three other members of the Court, said that after an accused asks for counsel, subsequent statements made without benefit of counsel are admissible if the accused "initiates" the dialogue. "Initiate" is defined in its "ordinary dictionary sense." *Id.* Statements made by an accused that "represent a desire on the part of an accused to open up a more generalized dis-

cussion relating directly or indirectly to the investigation ..." will satisfy the requirement of "initiate." *Id.* If the accused is found to have initiated the dialogue, the statement is voluntary. The next step under *Bradshaw, supra,* is a finding by the trial court that the accused waived his right to counsel. Waiver is found using the *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (knowing and intelligent waiver, *see, Bradshaw, supra,* 462 U.S. at ——, 103 S.Ct. at 2836, Powell, J., concurring), standard. In making the determination concerning waiver the trial court can look at the totality of the circumstances, including the conduct of the accused, his background and experience. *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757, 1758, 60 L.Ed.2d 286 (1979), quoting *Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. at 1023. Thus, the plurality opinion in *Bradshaw* requires that the trial court make two findings: 1) the accused initiated the discussion; and 2) the accused waived his right to counsel.

The dissent in *Bradshaw, supra,* written by Justice Marshall, in which three members of the court joined, agreed with the plurality's two-step analysis of initiation and waiver, but the dissent defines "initiate" more narrowly than the plurality. An accused initiates further communication for purposes of *Edwards* when his statements are *"about the subject matter of the criminal investigation."* *Bradshaw, supra,* 462 U.S. at ——, 103 S.Ct. at 2839 (Marshall, J., dissenting) (emphasis in original). The dissent concludes that to establish a waiver one of the necessary facts is that the accused initiated the dialogue as defined above.

Justice Powell, who concurred in the judgment, found the two-step analysis confusing. *Id.* at ——, 103 S.Ct. at 2837 (Powell, J., concurring). He found the *Zerbst* standard "widely understood and followed," and that "[i]t also comports with common sense." *Id.* For Justice Powell, a finding of a waiver necessarily indicates the statement is voluntary.

■ Eight justices endorse the two-step analysis, so we must apply it. We will now determine whether the judge below found that James initiated the communication and whether James waived his right to counsel. At the voluntariness hearing, Davis testified that James was alert, coherent, and did not appear to be under the influence of any intoxicant. He further testified that when he administered the *Miranda* warnings to James, James said he understood his rights but wanted to talk to Davis. James' later conduct indicates he understood his rights, because James invoked his right to counsel. When Davis tried to continue the interrogation, James' conduct again indicates he understood and was capable of exercising his rights, because James said a second time he wanted an attorney.

■ Both detectives testified that Midkiff's question was directed to Davis. Both testified that Midkiff faced Davis and asked the question in a normal tone of voice. Both detectives testified that no threats, promises or force were used to induce the statements. James did not testify at the voluntariness hearing.

The judge who presided over the voluntariness hearing said that James "knowingly, willingly, and voluntarily made" the statement and there were no threats, promises or force used to induce the statement. The judge did not explicitly state that Midkiff's question to Davis was not interrogation as defined in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), nor did he explicitly state in the order that James waived his right to counsel; however, we find that both are implicit in his findings based on this record.

There was uncontradicted testimony that James understood his rights. There was uncontradicted testimony that Midkiff's question was meant solely for Davis. Although the court did not employ all of the proper "buzz words," the record indicates that James made a decision to cooperate with the police without benefit of counsel, and his statement fits either definition of "initiate" in *Bradshaw, supra.* The judge's ruling indicates that the police did

not coerce James' statements, rather James, who knew his rights and how to exercise them, decided to cooperate. We hold that his statement was not obtained in violation of any of James' constitutional rights, as he initiated the communication and the judge implicitly found that James knowingly and intelligently waived his right to counsel.

Following this statement, James and the officers drove to Salome, Arizona, which was a two-hour drive. James directed the officers to the site, but no other words were spoken during the trip to Salome. At the site, and during the return trip James made inculpatory statements. Some of the statements were made in response to questions; some were not. These statements were made, as the judge below found, "knowingly, willingly and voluntarily" and after James decided to proceed without counsel.

■ In sum, the motion to suppress the statements was properly denied. It follows that the evidence found as a result of the statements was admissible.

■ We note that the voluntariness hearing in this case was before *Edwards* was explained in *Bradshaw* and strict compliance with *Bradshaw* was not, therefore, achieved. In future cases, judges shall state on the record their findings of fact and conclusions of law. We think this is compelled by a reading of the plurality and concurring opinions, both of which express a strong preference for the trial court to make a record that sets forth the reason for its decision.

## RIGHT TO JURY

■ James argues that he has a right under the United States and Arizona Constitutions to have a jury participate in sentencing. James argues, as did petitioner in *State v. Jordan*, 137 Ariz. 504, 506, 672 P.2d 169, 171 (1983), that he has a right to a jury finding that the statutory aggravating circumstances exist. This claim is without merit. *See id.*

## VOUCHING FOR STATE'S WITNESS

■ James argues that the prosecutor improperly vouched for the state's most important witness on direct examination, and James claims this conduct constitutes reversible error. Martin Norton was the state's only eyewitness. At the time of the crime he was fourteen years old, and he was a participant. On direct examination the prosecutor elicited that Norton had talked to the prosecutor before a plea agreement was reached and that Norton gave a statement. The prosecutor also elicited that Norton was then given a plea agreement in exchange for his truthful testimony. James argues that the state portrayed itself as the guarantor of the truthfulness of Norton's testimony. We find this issue is controlled by *State v. McCall*, 139 Ariz. 147, 159, 677 P.2d 920, 932 (1983) (state may elicit this testimony on direct examination), and the claim is without merit.

## AGGRAVATING CIRCUMSTANCES

There were two aggravating circumstances found in the case: pecuniary gain, A.R.S. § 13–703(F)(5); and heinous, cruel or depraved, *id.* at (F)(6). James challenges both findings.

■ James argues that because the jury acquitted him of aggravated robbery and theft, the trial court is barred from finding the aggravating circumstance of pecuniary gain. Although we see merit in the analysis of the trial judge in determining that the murder was committed for pecuniary gain, we are reluctant in a case of this nature to adopt an argument which requires some mental gymnastics to refute the findings of the jury. At best we are confronted with a reasonable doubt as to whether the defendant's motivation was pecuniary gain. We hold that in view of the findings of the jury, pecuniary gain is not established as an aggravating circumstance.

■ James argues that this murder was not heinous, cruel or depraved. The statutory expression of heinous, cruel, or

depraved is in the disjunctive, and all of the expressions or one of them " 'could constitute an aggravating circumstance.' " *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983) quoting *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). Cruelty is found when physical pain or mental distress is suffered by the victim. *Gretzler, supra*, 135 Ariz. at 51, 659 P.2d at 10. "[H]einous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." *Id.* Heinous means "hatefully or shockingly evil; grossly bad," *id.*, and depraved means "marked by debasement, corruption, perversion or deterioration," *id.*

■ We have no doubt but that this murder meets each of the statutory expressions contained in A.R.S. § 13–703(F)(6). The murder was especially cruel. As the trial court said:

> The evidence unquestionably shows beyond doubt that the victim in this case suffered prolonged and excruciating mental, physical and psychological pain and distress, and that such pain and distress were inflicted deliberately and sadistically. Several hours passed between the time the Defendant and his co-murderers formed the intent to kill the victim and the time that they did kill him. During this time the victim was viciously beaten all over his body, including his head, face and groin. He was taunted and his murder was openly and blithely discussed in his presence. Early in the evening, he attempted to escape, and was caught by the Defendant and returned to the Defendant's home. His repeated pleas to be released in return for all his valuables were rejected. He was robbed of all possessions he had with him. He was held at gunpoint for hours. He was kidnapped and spent hours traveling to the scene of his death in his own automobile. After finally arriving at the scene of his murder in a remote, isolated desert area, he was shot, causing his clothing to catch on fire. He was then viciously

beaten with fists, boards and rocks until finally he expired. The evidence shows that he had been beaten beyond recognition prior to his death. In short, the murder was committed in an especially cruel manner.

■ The murder was committed in an especially heinous and depraved manner. Again, as the trial court said:

> First, this was a totally senseless murder. [T]here was no reason for the killing other than the perpetrators' greed and their arrogation to themselves of the role of executioners to those whose sexual preferences they purport to decry. The Defendant carried out this murder in a depraved manner, indicating a total disregard of even minimal feelings of compassion for a fellow human being. The manner in which the killing was accomplished has already been detailed. Following the killing, the Defendant bragged about his role in it and of the difficulty he and the others had in finally making Juan Maya die. Defendant's statements evidence no compassion or remorse and indicate he felt he was justified in killing someone who he believed to be different than himself. The mode of disposing of the body itself demonstrates a certain callousness and depravity and disregard for the victim's family who might never have learned of the fate of Juan Maya, but for the later brazenness of the Defendant and his co-murderers. This Defendant did commit the murder in an especially heinous and depraved manner.

The trial judge's finding is correct. *See Gretzler, supra*, (among others, the following items tend to prove this aggravating circumstance: the senselessness of the murder, *id.* at 52, 659 P.2d at 11, the relishing of the murder by the killer, *id.*, and "the infliction of gratuitous violence on the victim," *id.*).

## INTENT TO KILL

James argues that his sentence of death is invalid because the trial judge did not specifically state on the record that James

intended to kill. *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *State v. McDaniel,* 136 Ariz. 188, 210, 665 P.2d 70, 81 (1983), we said:

> In order to comply with *Enmund,* therefore, we believe that in future cases where the jury might have found the defendant guilty of first degree murder based on a felony-murder theory, the trial judge must determine beyond a reasonable doubt prior to imposing a sentence of death that the defendant killed, attempted to kill or intended to kill. This determination, of course, must be in addition to those procedures specified in A.R.S. § 13–703.

The trial judge sentenced James on November 23, 1982; this court decided *McDaniel, supra,* on April 28, 1983. Thus, this case is similar to *State v. Jordan,* 137 Ariz. 504, 508, 672 P.2d 169, 172 (1983). In *Jordan,* the petitioner was sentenced to death before *McDaniel, supra,* was decided, and this court made the determination that, for purposes of sentencing, petitioner intended to kill. We did this because McDaniel's requirement that the trial judge must make the finding is, by its own terms, applicable only to cases decided after the *McDaniel* decision. Although *Enmund, supra,* must be complied with in all cases, *McDaniel, supra,* (trial court is to make *Enmund* findings) must only be complied with in cases decided after *McDaniel.* We think the evidence shows beyond a reasonable doubt that James killed and intended to kill. As the trial court said: "The defendant did commit the offense ...."

## MITIGATING CIRCUMSTANCES

James claims he was under duress when the crime was committed, *see* A.R.S. § 13–703(G)(2), and that his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired, *see id.* at (G)(1). The trial court found that neither of these mitigating circumstances existed.

James testified at length concerning his fear of Larry Libberton, who also killed the victim. James said his involvement in the murder was procured through the direct threats on his life by Libberton. The trial judge characterized James' testimony on this point as "blatant perjury." We think James' testimony on this point lacked credibility; James was a willing participant. This mitigating circumstance was not established.

James claims that on the day of the murder he was under the influence of a hallucinogen, LSD. The evidence of drug ingestion was unrefuted but it was uncorroborated. The record reveals that James' capacity on the night of the crime was not impaired. This mitigating circumstance was not established.

James states that two additional mitigating circumstances are now present. He concludes that he is a model prisoner. He has not alleged any facts to support this claim and it is not established. He claims he realizes the wrongfulness of his conduct and he feels genuine remorse. Again, the trial judge heard James state that he was remorseful, and did not believe it. This mitigating circumstance was not established. There is an aggravating circumstance and no mitigating circumstances sufficiently substantial to call for leniency.

## PROPORTIONALITY REVIEW

This court conducts a proportionality review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977). We also consider cases in which the death penalty was reduced to life imprisonment. *State v. McCall,* 139 Ariz. 147, 677 P.2d 920 (1983).

This case is very similar to *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983). In that case defendant and his accomplice terrorized the victim for some time, then

beat the victim to death with rocks and buried her in the Superstition Mountains. Of course, the instant case is the companion case to *State v. Libberton*, 141 Ariz. 132, 685 P.2d 1284 (1984), recently decided by this court. In *Libberton*, we found the death penalty to be proportional.

In *Libberton, supra,* we found *McDaniel, supra,* in which we reduced the sentence to life imprisonment, not to be analogous. In *McDaniel* the victim was beaten, tied, gagged, wrapped in a blanket, and had liquor poured down his throat. He was then locked in a trunk of an automobile during a Phoenix summer day. We reduced the penalty to life imprisonment because we found other facts that led us to conclude that the murderers' actions were designed to confuse the victim in hopes of avoiding apprehension, and did not necessarily show an intent to kill. We found that the murderers left the car keys in the ignition and left the windows rolled down, and the car itself was left in a busy parking area. We found these mitigating circumstances sufficiently substantial to call for leniency. We find no such mitigating circumstances.

We hold that imposing the death penalty in this case is not disproportionate to the penalty imposed in similar cases. The death penalty is properly imposed in this case.

We have reviewed the record for fundamental error, A.R.S. § 13–4035, and have found none. The judgments of conviction and the sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and FELDMAN, J., concur.

*Note:* Justice James Duke Cameron did not participate in the determination of this matter.