No. 84–5191.  JAMES *v.* ARIZONA.  Sup. Ct. Ariz.  Certiorari denied.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976), I would grant certiorari and vacate the death sentence in this case.  Even if I felt otherwise, however, I would grant certiorari in this case because the underlying conviction raises grave constitutional issues.

I

At stake in this case are the limits the Fifth Amendment places on official custodial interrogation of an accused who has invoked the right to assistance of counsel.  See *Solem* v. *Stumes*, 465 U. S. 638 (1984); *Oregon* v. *Bradshaw*, 462 U. S. 1039 (1983); *Edwards* v. *Arizona*, 451 U. S. 477 (1981).  Admitting certain incriminating evidence against petitioner James in this case, the

Arizona trial court ignored the principles of *Edwards* and its progeny. To affirm the trial court, the Arizona Supreme Court applied *Edwards* and *Bradshaw* in a way that departs substantially from our intendment in those cases and merits plenary review. Because Arizona plans to execute James if this constitutionally infirm conviction stands, our responsibility to undertake review is clear.

## II

On November 19, 1981, Phoenix police officers arrested James for the murder of Juan Maya. Shortly after the arrest, Officer Davis of the Phoenix force escorted James to a small, windowless room and began an interrogation. Officer Davis read James his *Miranda* rights and then informed him that he would be charged with first-degree murder. Tr. 5–7 (Aug. 27, 1982). About 19 minutes into the interrogation, James asked Davis what would happen with respect to the murder charge. Davis responded that if James was found guilty the result would be up to the court. James appears to have perceived this statement as an intimation that capital punishment was possible, because at this point he made his first request for an attorney. *Id.*, at 9–10 (Sept. 3, 1982). Instead of terminating the interrogation, the officer continued to press James to make some kind of a statement; Davis told James he was "only trying to get the facts of the case and giving [James] the opportunity to tell his side of it too." *Id.*, at 8–10. According to the subsequent testimony of Officer Davis, James' response was hesitant and uncertain. He first suggested he might be willing to proceed without an attorney but then reversed himself and requested an attorney once again. *Ibid.* This second request for an attorney prompted Officer Davis to pick up his papers, stand and open the door. As he opened the door he encountered Sergeant Midkiff, the officer supervising this investigation, who was standing just outside. *Id.*, at 10–11. As soon as he saw Officer Davis, Midkiff asked "is he going to show us where the body is?" *Id.*, at 44 (Aug. 27, 1982). Midkiff later testified that he stood close to James when asking this question. Midkiff also testified that James "might have assumed" the question was intended for him. *Id.*, at 52–53. Officer Davis and James responded to Midkiff's inquiry simultaneously. As Davis told Midkiff that James had invoked his right to counsel, James said "I'll show you where the body is." *Id.*, at 44–45. Midkiff immediately asked James where the body was and James

responded that it was approximately 100 miles from Phoenix. *Id.*, at 44–47. Neither officer made any effort to remind James of his right to counsel and neither sought an express oral or written waiver of that right.

Instead of providing James with an attorney, the officers readied a police car for a trip to the site of Juan Maya's body. Sergeant Midkiff instructed all officers to refrain from questioning James while the car was being readied. *Id.*, at 57. Midkiff also phoned a prosecutor for advice on whether, in light of James' request for an attorney, the officers should proceed with the proposed journey. The prosecutor told Midkiff to proceed. Davis then escorted James to the patrol car and requested directions to the site of the body. *Id.*, at 55–56. James obliged and led Davis to an abandoned mine shaft about 100 miles from Phoenix. At the base of the shaft the officers found the body of Juan Maya. *Id.*, at 53–55.

At his trial for capital murder James sought to suppress the incriminating statements but the trial court held the statements admissible. James was convicted and sentenced to death. The Arizona Supreme Court affirmed the conviction and sentence. 141 Ariz. 141, 685 P. 2d 1293 (1984). James then petitioned this Court for certiorari. While the petition was under consideration, the State of Arizona set James' execution date for October 3, 1984. The Arizona Supreme Court denied a stay of execution pending this Court's disposition of the petition for certiorari. JUSTICE REHNQUIST granted a stay of execution to permit consideration of the petition.

## III

When an accused in custody requests the assistance of counsel the Fifth Amendment requires that all "interrogation must cease until an attorney is present." *Miranda v. Arizona,* 384 U. S. 436, 474 (1966). To ensure that officials scrupulously honor this right, we have established in *Edwards v. Arizona, supra,* and *Oregon v. Bradshaw, supra,* the stringent rule that an accused who has invoked his Fifth Amendment right to assistance of counsel cannot be subject to official custodial interrogation unless and until the accused (1) "initiates" further discussions relating to the investigation, and (2) makes a knowing and intelligent waiver of the right to counsel under the standard of *Johnson v. Zerbst,* 304 U. S. 458, 464 (1938), and its progeny. See *Solem v. Stumes,* 465

U. S. 638 (1984). Under this approach, an accused's initiating statement is admissible if it is voluntary and not made in response to interrogation, *Edwards*, 451 U. S., at 485–486, but the accused's subsequent responses to interrogation are admissible only if the accused has, after the initiation, made a knowing and intelligent waiver of the right to counsel.

In this case James twice invoked his right to counsel during the course of interrogation; James "expressed his own view" that he was "not competent to deal with the authorities without legal advice." *Michigan* v. *Mosley*, 423 U. S. 96, 110, n. 2 (1975) (WHITE, J., concurring). The statement he made only a few seconds after requesting counsel for the second time—"I'll show you where the body is"—was therefore properly admitted into evidence only if it was a voluntary initiation of new discussions. The followup colloquy that led to discovery of the body was properly admitted into evidence only if that statement was an initiation *and* if, prior to further official questions and James' responses to those questions, James knowingly and intelligently waived his previously invoked right to counsel.

*1. "Initiation."* Under the strict rule of *Edwards* and *Bradshaw* once an accused has invoked the right to counsel no further interrogation is permitted until the accused initiates a new dialogue with the authorities. *Solem* v. *Stumes, supra,* at 646. Sergeant Midkiff's query "[i]s he going to show us where the body is," though directed at Officer Davis, indisputably triggered James' statement "I'll show you where the body is." That James made the statement in response to Midkiff's inquiry is not, however, determinative of the "initiation" question. If Midkiff's inquiry is not viewed as interrogation for Fifth Amendment purposes, then James' response might be a voluntary initiation of dialogue. Some official statements made within earshot of an accused in custody are not "interrogation" even if they prompt a response. In *Rhode Island* v. *Innis*, 446 U. S. 291 (1980), the Court held:

> "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the

police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.*, at 300–301 (footnotes omitted).

The *Innis* approach "focuses primarily upon the perceptions of the suspect," *id.*, at 301, and mandates inquiry into whether the words or actions of the authorities bring to bear any coercive pressure "above and beyond that inherent in custody itself." *Id.*, at 300. Consonant with the approach in *Miranda*, this inquiry "vest[s the] suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." 446 U. S., at 301. This perspective is tempered, *Innis* makes clear, to the extent that the police ought not be "held accountable for the *unforeseeable* results of their words or actions." *Id.*, at 302 (emphasis added). In general, though, *Innis* defines interrogation broadly and flexibly in recognition of the enhanced coercive pressures that official words or conduct may impose on an accused in the "interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner." *Miranda*, *supra*, at 457.

At the suppression hearing, the state trial court made no findings as to whether James' statement was an "initiation" under *Edwards* or a response to interrogation as defined in *Innis*. The court merely concluded without explanation that James had "'knowingly, willingly, and voluntarily made' the statement." 141 Ariz., at 145, 685 P. 2d, at 1297 (quoting unpublished trial court minute order). Under *Edwards*, of course, a statement could be made knowingly, willingly, and voluntarily and yet be inadmissible because the statement was obtained in response to interrogation occurring after an accused had invoked the right to counsel and absent any initiation of new dialogue by the accused. *Edwards*, *supra*, at 485 ("[I]t is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel"). Thus the trial court finding is of no relevance to the "initiation" inquiry that *Edwards* and *Bradshaw* mandate.

The Arizona Supreme Court endeavored to paper over this deficiency. Acknowledging the trial court's failure to make the requisite finding of initiation—and subsidiary failure to determine whether Midkiff's question was "interrogation" under *Innis*—the court held that such a finding was nonetheless "implicit" in the

lower court decision.  141 Ariz., at 145, 685 P. 2d, at 1297. The following four assertions encompass the entirety of the State Supreme Court's justification for this divination of the "implicit" finding:

> "[1] There was uncontradicted testimony that James understood his rights.  [2] There was uncontradicted testimony that Midkiff's question was meant solely for Davis.  [3] Although the [trial] court did not employ all of the proper 'buzz words,' the record indicates that James made a decision to cooperate with the police without benefit of counsel, and [4] his statement fits either definition of 'initiate' in *Bradshaw*."  *Ibid.*

Three of these stated reasons have no bearing on the determinative question whether James spoke the first incriminating words on his own initiative or in response to interrogation.  That James knew his rights has no relevance to whether Midkiff's inquiry should be viewed as interrogation.  That James "made a decision to cooperate" is similarly irrelevant: if his "decision to cooperate" was prompted by interrogation occurring after he invoked his right to counsel, and absent an intervening "initiation," any cooperative statements he made are inadmissible under *Edwards*. The court's claim that James' statement was initiation "under either definition of the term in *Bradshaw*" is also inapposite to the "interrogation" aspect of the initiation analysis.  In *Bradshaw* the plurality and dissent disagreed over how related to the subject of the investigation the initiating statement need be to justify resumption of official interrogation.  The plurality suggested an expansive view of what might qualify as initiation, 462 U. S., at 1045, and the dissent proposed a much more circumscribed view. *Id.*, at 1053–1054 (MARSHALL, J., dissenting).  The statement in this case was sufficiently related under either view expressed in *Bradshaw* but this fact has nothing to do with whether the statement was made in response to interrogation.

The *only* potentially relevant reason the state court gave for perceiving an implicit finding of "initiation" was the purportedly uncontradicted testimony that Sergeant Midkiff directed his inquiry at Officer Davis and not at James.  This assertion, even if valid, provides little support for the conclusion that James' statement was an independent "initiation."  The proper inquiry under *Innis* is whether the official should know that the statement is reasonably likely to elicit an incriminating response from the

suspect. *Innis*, 446 U. S., at 301. A bare finding that Midkiff directed his question to Davis and not to James is but the beginning of the *Innis* inquiry; had the officer directed the question to James, "interrogation" *vel non* would not be an issue. The question that must be answered under *Innis* is whether Midkiff's statement, though not aimed at James, should be viewed as the "functional equivalent" of interrogation in these circumstances because Midkiff should have known that the statement was reasonably likely to elicit an incriminating response from the accused. *Id.*, at 302. Relying only on the fact that Midkiff spoke to Davis and not James, the Arizona Supreme Court has done little more than restate the question under *Innis*.

That the Arizona Supreme Court could not salvage a plausible finding of "initiation" is perhaps not surprising. The facts demonstrate that from James' perspective Midkiff's question created significant coercive pressure over and above that inherent in custody itself. When Sergeant Midkiff asked his question he stood only a few feet from James in the interrogation room. Midkiff admitted at the suppression hearing that James "might have assumed" the question was meant for him, Tr. 52–53 (Aug. 27, 1982), as well he might because the question sought information for which he had to have been the original source. Like many of the interrogation techniques deplored in *Miranda* for their tendency to overbear the will of an accused in custody, Midkiff's question presumed guilt and suggested to James that the purpose of the interrogation was simply to force him to accede to the inevitable. See *Miranda*, 384 U. S., at 450–451; *Innis, supra*, at 299. Projecting an air of confidence in the suspect's guilt is a recommmended interrogation tactic precisely because of the enhanced coercive pressure it brings to bear on a suspect. See F. Inbau & J. Reid, Criminal Interrogation and Confessions 26 (2d ed. 1967).

The timing of Midkiff's question exacerbated its coercive impact. Occurring only seconds after Davis had completed his direct questioning, the Midkiff inquiry must have seemed to James simply one more question in the intensive interrogation to which he had been subjected up until a few seconds before. The enhanced coercive pressures of the direct questioning in the interrogation room were not likely to have dissipated in the few seconds between Davis' final question and Midkiff's question. Because James' first request for an attorney had not succeeded in cutting

off interrogation, James would have had no reason to think that his second request would be any more effective. Under these circumstances the statement "I'll show you where the body is" must be viewed as the product of compulsion produced by coercive pressures that were at least the functional equivalent of direct questioning.

Under *Innis*, only if Sergeant Midkiff could not reasonably have foreseen that his question would prompt an incriminating response should the response be found to be a voluntary "initiation." The preceding discussion should make clear that the response of James was entirely foreseeable under the coercive circumstances then present. Nor is this a case like *Innis* in the sense that the authorities would have had no reason to foresee that their "few offhand remarks" would touch a peculiar psychological susceptibility in the accused and thereby evoke an incriminating response. *Innis, supra,* at 302–303. Midkiff should reasonably have foreseen that under the coercive circumstances then present, his question to Davis was likely to evoke an incriminating response from even a veteran of the interrogation room.

At bottom, the "initiation" aspect of the *Edwards* test is meant to protect the Fifth Amendment rights of a suspect who has decided that he or she is not competent to handle the coercive pressures of custodial interrogation without a lawyer. The requirement of an "initiation" ensures that an accused has independently changed his or her mind about the need for a lawyer, and has not had his or her mind changed by the coercive pressure of continued direct questioning or its functional equivalent. In no sense can James be said to have made such an independent judgment.

2. *"Waiver."* Even if one accepts, *arguendo*, that James initiated the conversation about the location of the body, such a conclusion permits introduction at trial of only the initiating statement. *Edwards*, 451 U. S., at 485–486. Immediately after James made the first incriminating statement, Midkiff directly asked James where the body was. Whatever the status of Midkiff's first question to Davis, this question to James and the follow-up questions as to the exact location of the body are interrogation under any definition. James' incriminating responses and their evidentiary fruits were properly admitted at trial only if James made a knowing and intelligent waiver of his previously

invoked right to counsel. *Oregon* v. *Bradshaw*, 462 U. S. 1039 (1983). The test is that of *Johnson* v. *Zerbst:* indulging every reasonable presumption against waiver, was there a knowing and intelligent waiver in light of the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused?" 304 U. S., at 464.

The state trial court failed to apply the proper legal standard in evaluating whether the incriminating statements should be admitted. The court merely found that James " 'knowingly, willingly, and voluntarily *made' the statement*," 141 Ariz., at 145, 685 P. 2d, at 1297 (quoting unpublished trial court minute order) (emphasis added), and did not find that James knowingly and intentionally relinquished his right to counsel. Though the trial court's finding might suffice under the "voluntariness" standard of *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 226, 227 (1973), it falls short under the more exacting test of *Johnson* v. *Zerbst.*

The Arizona Supreme Court's efforts to rehabilitate the trial court on this issue are no more availing than were its similar efforts on the initiation question. The State Supreme Court held that a constitutionally sufficient finding of waiver was implicit in the trial court opinion. See 141 Ariz., at 144–145, 685 P. 2d, at 1296–1297. Though the analysis that led the court to this conclusion is not crystalline, the court appears to have found waiver because James knew his rights (he twice invoked them), was not subject to threats or promises, and made a conscious decision to cooperate, expressed in his *initiation* of dialogue with the authorities. *Ibid.* The opinion makes clear that the court found waiver implicit in the *initial* incriminating statement and not in anything James did or said subsequent to that initial statement. *Id.*, at 145, 685 P. 2d, at 1297.

This analysis cannot pass muster under *Edwards.* In every *Edwards* case that reaches the waiver stage of the analysis, the accused will have necessarily invoked the right to counsel and subsequently initiated a dialogue. If these two facts alone support an affirmative finding of knowing and intelligent waiver of the right to counsel, then the further requirement in *Edwards* and *Bradshaw* of an explicit finding of subsequent waiver becomes superfluous. *Bradshaw* made clear that "even if a conversation . . . is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that *subsequent*

*events* indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." 462 U. S., at 1044 (emphasis added). The court here pointed to no subsequent events in which James affirmatively indicated an intention to waive his right to counsel.

No fair reading of the facts of this case will support a finding of waiver. See *Fare* v. *Michael C.*, 442 U. S. 707, 726–727 (1979). This Court indulges a strong presumption against finding a waiver of the right to counsel, especially when the accused has not made such a waiver explicit. See *Miranda* v. *Arizona*, 384 U. S., at 475; *Johnson* v. *Zerbst*, 304 U. S., at 464. That presumption should apply with particular force in this case because James was never reminded of his right to counsel after he allegedly initiated new discussions with Officer Davis and Sergeant Midkiff. This important circumstance distinguishes the present case from recent cases in which the Court has found a valid waiver of a previously invoked right to counsel. In both *Oregon* v. *Bradshaw*, *supra*, and *Wyrick* v. *Fields*, 459 U. S. 42 (1982), the police gave the accused a thorough reminder of his right to counsel prior to official reinterrogation after an initiation. See *United States* v. *Montgomery*, 714 F. 2d 201 (CA1 1983). While a prophylactic rule requiring such reminders in every case might be an appropriate safeguard of this core right, cf. *North Carolina* v. *Butler*, 441 U. S. 369, 377 (1979) (BRENNAN, J., dissenting), at the very least an especially strong presumption against finding waiver should apply absent such a reminder.

Because James never specifically indicated a waiver of his rights, a finding of waiver must be based on inference. If waiver is to be inferred on these facts it would have to be inferred solely from James' decision to respond to the questions that Midkiff and Davis put to him after he invoked his right to counsel. His first response to a direct question—Midkiff's inquiry about the location of the body—occurred only seconds after James had invoked his right to counsel and only a split second after he had purportedly "initiated" a new dialogue. Tr. 44–46 (Aug. 27, 1982). Inferring waiver from the bare fact that an accused responded to interrogation is under any circumstances extremely dubious. *Edwards*, 451 U. S., at 484; *Miranda* v. *Arizona*, *supra*, at 474; *Carnley* v. *Cochran*, 369 U. S. 506, 516 (1962). And the instant circum-

stances simply will not support such an inference of a split-second change of mind in the coercive interrogation environment.\*

Absent any specific affirmative signal of waiver, any thorough reminder to petitioner of his rights after initiation, and with only inferences from the fact that James responded to interrogation, I do not see how this Court can sanction a finding of waiver under these circumstances, particularly in a capital case. Declining review of so substantial a departure from *Johnson* v. *Zerbst* and its progeny, this Court shirks its primary role in reviewing the decisions of state courts "'to make sure that persons who seek to *vindicate* federal rights have been fairly heard.'" *Florida* v. *Meyers*, 466 U. S. 380, 385 (1984) (STEVENS, J., dissenting) (quoting *Michigan* v. *Long*, 463 U. S. 1032, 1068 (1983) (dissenting opinion) (emphasis in original). When a petitioner seeking vindication of a federal right risks execution if that right is not vindicated the responsibility to review is one this Court must accept.

## IV

Perhaps the Court is disinclined to review this case on the mistaken view that the case involves only the application of settled constitutional principle to the instant facts. I have made plain that I think clarification is needed with respect to the application of *Johnson* v. *Zerbst, supra,* to custodial waiver of the previously invoked right to counsel. More importantly, in the realm of constitutional protections of the accused the sensitivity to factual nuance that marks so many of our current doctrines requires this Court in the proper case to exercise its powers of review to correct egregious departures from the intendment of our precedents. Incessant reliance on the precept that review is unnecessary when a case involves no more than application of settled principles to fact risks draining our constitutional protections of all protective vitality. The present case illustrates the point. If the instant facts support a finding of initiation and waiver under *Edwards* v. *Arizona, supra,* then the protections set forth in that case are illusory. Only by granting review in aberrant cases such as this can the Court make clear that the tests set forth for deciding the

---

\*Midkiff and Davis certainly did not perceive James as having waived his rights under the circumstances. Midkiff instructed all officers not to question James, and Davis testified that he deliberately avoided interrogating James because he thought he had a legal obligation to refrain. Tr. 50–51 (Aug. 27, 1982).

bounds of the Constitution's protections of individual rights are meant not as manipulable technicalities in the service of empty slogans but as bulwarks of our most precious liberties.