IN THE COURT OF APPEALS



FILED BY CLERK

JUN 29 2007

COURT OF APPEALS
DIVISION TWO

THE STATE OF ARIZONA,    )
                         )
           Appellee,     )        2 CA-CR 2005-0320
                         )        DEPARTMENT A
      v.                 )
                         )        O P I N I O N
ZACHARY SAMUEL EGGERS,   )
                         )
           Appellant.    )
_____)

APPEAL FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR200301056

Honorable Stephen M. Desens, Judge

AFFIRMED

---

Terry Goddard, Arizona Attorney General
  By Randall M. Howe and Alan L. Amann                          Tucson
                                                    Attorneys for Appellee


Harriette P. Levitt                                             Tucson
                                                    Attorney for Appellant

---

V Á S Q U E Z, Judge.

¶1 A jury found Zachary Samuel Eggers guilty of two counts of first-degree murder, and the trial court sentenced him to two, consecutive, natural life terms of imprisonment. On appeal, he asserts that A.R.S. § 13-501, Arizona's automatic filing statute that requires juveniles charged with certain crimes to be tried as adults, violates his state and federal due process rights; the trial court's refusal to suppress his confessions constitutes reversible error; and natural life sentences for juveniles constitute cruel and unusual punishment. For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

¶2 We view the facts and all reasonable inferences therefrom in the light most favorable to upholding the convictions. *See State v. Carlos*, 199 Ariz. 273, ¶ 2, 17 P.3d 118, 120 (App. 2001). On Monday, December 8, 2003, Bradley Eggers, Sr. left work around noon to have lunch with his wife Delyn Eggers. Both were employed by the Department of Corrections, but worked different shifts. Bradley did not return to work that day, and both failed to show up for work or call the next day. When they did not come to work or call on Wednesday, a coworker contacted the sheriff's department to request a "welfare check."

¶3 Deputies contacted Joshua, Bradley and Delyn's youngest son, and Michele, a cousin who had been living with the Eggers family, at school. Deputies later contacted Zachary, then sixteen years old, at the school. All three separately accompanied the deputies to the Eggerses' residence, and Joshua let detectives into the house to conduct the

2

welfare check. After finding nothing that indicated Bradley's and Delyn's whereabouts, the detectives obtained a warrant to search the property. In Zachary's room, the detectives found his father's wallet, his mother's purse, a 12-gauge shotgun, $77 in cash, and a brick of marijuana. The single fingerprint later found on the gun matched Zachary's right little finger.

¶4        After concluding their search of the house that evening, detectives took Zachary, Joshua, and Michele to the sheriff's department substation where they were individually questioned about Bradley's and Delyn's disappearance. Zachary's adult older brother, Bradley Eggers, Jr. (Bradley Jr.) had been notified of his parents' disappearance and was asked to meet the detectives at the family residence. The detectives also asked him to be present at the substation while they interviewed Joshua, Michele, and Zachary, none of whom was given *Miranda*[1] warnings prior to being interviewed. Approximately thirty minutes into his interview, Zachary confessed to murdering his parents. Detectives immediately stopped the interview, administered *Miranda* warnings, and resumed questioning one minute later. Zachary then gave a detailed account of the murders and told detectives where he had buried his parents' bodies on the Eggerses' property. He was then arrested and charged with two counts of first-degree murder. A jury found him guilty of both counts, and after a sentencing hearing, the court sentenced him to natural life in prison. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21 and 13-4033.

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3

## II. The Automatic Filing Statute

¶5        Eggers challenges the constitutionality of Arizona's automatic filing statute, A.R.S. § 13-501(A), which mandates a county attorney to "bring a criminal prosecution against a juvenile in the same manner as an adult" when the juvenile is fifteen, sixteen, or seventeen years of age and is charged with certain violent crimes, including first-degree murder. He argues the automatic filing of charges against juveniles in adult court violates federal and state constitutional prohibitions against cruel and unusual punishment and his state and federal due process rights because it fails to require "individualized consideration" of a juvenile before permitting the juvenile to be tried as an adult.[2]

¶6        We review a statute's constitutionality de novo. *State v. Korzuch*, 186 Ariz. 190, 192, 920 P.2d 312, 314 (1996). "There is a strong presumption supporting the constitutionality of statutes, and the party challenging the validity of a statute has the burden to establish its invalidity beyond a reasonable doubt." *State v. Padilla*, 169 Ariz. 70, 71, 817 P.2d 15, 16 (App. 1991).

---

[2]Eggers asserts the statute violates amendments V, VI, VIII, and XIV to the United States Constitution and article II, §§ 4, 11, 15, 23, and 24 of the Arizona Constitution. However, he specifically supports only Eighth Amendment and due process claims in his brief. Additionally, Eggers's argument that A.R.S. § 13-501 violates the Eighth Amendment because it fails to require transfer hearings is indistinct from his argument that natural life sentences for juveniles are unconstitutional. *Cf. State v. Davolt*, 207 Ariz. 191, ¶¶ 97-109, 84 P.3d 456, 478-81 (2004) (discussing Eighth Amendment challenge to § 13-501's lack of transfer hearing requirement in tandem with defendant's Eighth Amendment challenge to death sentence). To the extent he challenges the lack of a transfer hearing, that argument is addressed in Part II of this opinion. To the extent he challenges his sentence as a result of having been tried as an adult pursuant to § 13-501, that argument is addressed in Part V.

4

## A. State due process claim

¶7 In 1996, Arizona voters passed Proposition 102, amending the Arizona Constitution to grant the legislature, or the people by initiative or referendum, the authority to enact laws regarding all proceedings and matters affecting juvenile offenders. Ariz. Const. art. IV, pt. 2, § 22. The amendment provides in pertinent part:

> In order to preserve and protect the right of the people to justice and public safety, and to ensure fairness and accountability when juveniles engage in unlawful conduct . . . :
>
> 1. Juveniles 15 years of age or older accused of murder, forcible sexual assault, armed robbery or other violent felony offenses as defined by statute shall be prosecuted as adults.

*Id.* Section 13-501 was enacted to implement the constitutional amendment authorizing the automatic filing of charges in adult criminal court when a juvenile has reached a certain age and is alleged to have committed either violent or repeated felonies. Section 13-501(A) provides in relevant part:

> The county attorney shall bring a criminal prosecution against a juvenile in the same manner as an adult if the juvenile is fifteen, sixteen or seventeen years of age and is accused of any of the following offenses:
>
> 1. First degree murder . . . .

¶8 "The stated intent of Proposition 102 was to make possible more effective and more severe responses to juvenile crime." *State v. Davolt*, 207 Ariz. 191, ¶ 100, 84 P.3d 456, 479 (2004). And "[t]he effect of the constitutional amendment and legislation was to subject older juvenile offenders accused of violent crimes to the adult criminal system,

5

unless specifically excepted." *State v. Oaks*, 209 Ariz. 432, ¶ 13, 104 P.3d 163, 166 (App. 2004). Because the state constitution explicitly authorizes the part of the statute in question, and the statute contains essentially the same language as the constitution, the statute cannot offend state constitutional provisions.

**B. Federal due process claim**

¶9 We next turn to Eggers's claim that the lack of individualized consideration under the automatic filing statute violates his due process rights under the Fifth and Fourteenth Amendments. He asserts that juveniles have a due process right to a judicial determination of their fitness to stand trial as adults. In support, Eggers relies on Arizona and United States Supreme Court cases decided before the death penalty was held to be unconstitutional when applied to juveniles in *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005), that mandated a case-by-case determination in juvenile death penalty cases. In *Davolt*, 207 Ariz. 191, ¶ 110, 84 P.3d at 481, our supreme court held that "the State may not seek the death penalty against a juvenile pursuant to Arizona's Automatic Filing Statute . . . without an individual assessment of the juvenile's maturity and moral responsibility at the time of the offense." *See also Stanford v. Kentucky*, 492 U.S. 361, 375, 109 S. Ct. 2969, 2978 (1989) (individualized consideration required in "the realm of capital punishment"), *abrogated by Simmons; Thompson v. Oklahoma*, 487 U.S. 815, 834, 108 S. Ct. 2687, 2698 (1988) ("'[P]unishment should be directly related to the personal culpability of the criminal defendant.'"), *quoting California v. Brown*, 479 U.S. 538, 545,

6

107 S. Ct. 837, 841 (1987) (O'Connor, J., concurring); *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 874 (1982) (applying rule that all mitigating evidence offered by defendants to support sentence other than death must be considered).

¶10 Eggers correctly asserts that in these cases, the courts recognized the inherently less culpable nature of juveniles. *See Simmons*, 543 U.S. at 572-73, 125 S. Ct. at 1197 ("The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability."); *Thompson*, 487 U.S. at 834, 108 S. Ct. at 2698 (adolescents are less mature and responsible than adults); *Eddings*, 455 U.S. at 115-16, 102 S. Ct. at 877 (same); *Davolt*, 207 Ariz. 191, ¶ 103, 84 P.3d at 480 (recognizing juveniles "have lower levels of maturity and culpability than adults").

¶11 From this language, Eggers asks us to extrapolate that juveniles have a due process right to a hearing before being subjected to trial as an adult. As we understand his argument, Eggers contends the courts' recognition that juveniles are less mature and less responsible than adults, resulting in the requirement for an individualized consideration of culpability prior to *Simmons* and in *Simmons* abolishing the death penalty for juvenile offenders, also mandates a hearing to determine whether a juvenile is sufficiently culpable to be tried as an adult. Eggers asserts that "[h]ad he been eligible for evaluation by the juvenile court, he would have had a chance at rehabilitation and eventual reintegration into society."

7

¶12        Implicit in this argument is the notion that juveniles have a protected liberty interest in being adjudicated in the juvenile system. But Division One of this court has addressed and rejected this precise argument in *Andrews v. Willrich*, 200 Ariz. 533, 29 P.3d 880 (App. 2001). There, the defendant challenged the constitutionality of § 13-501(B)[3] on separation of powers and due process grounds. 200 Ariz. 533, ¶ 5, 29 P.3d at 882. In addressing the state and federal due process arguments, the court noted "[d]ue process requires a meaningful opportunity to be heard only when a person may be deprived of life, liberty, or property." *Id.* ¶ 23. But, it said, "our constitution clearly provides that juvenile offenders do not possess rights to be adjudicated in juvenile court." *Id., citing* Ariz. Const. art. IV, pt. 2, § 22. Therefore, the court concluded, "due process does not require that a juvenile offender be afforded notice and an opportunity to be heard" before being tried as an adult. *Id*.

¶13        Other state and federal courts considering the issue have also soundly rejected the argument that juveniles have a due process right to be adjudicated in the juvenile system. *See, e.g., Woodard v. Wainwright*, 556 F.2d 781, 787 (5th Cir. 1977); *Manduley v. Superior Court*, 41 P.3d 3, 22 (Cal. 2002); *State v. Angel C.*, 715 A.2d 652, 662 (Conn. 1998); *Hansen v. State*, 904 P.2d 811, 822 (Wyo. 1995). *But see Kent v. United States*, 383 U.S. 541, 562, 86 S. Ct. 1045, 1057 (1966) (holding that when hearing is required by

---

[3]Under A.R.S. § 13-501(B), the county attorney has discretion to prosecute juveniles as adults for certain felonies if they are at least fourteen years of age at the time the crime is committed.

statute, hearing must satisfy basic due process requirements). Accordingly, we find due process does not require a hearing before a juvenile is tried as an adult under § 13-501(A), and the statute does not violate Eggers's due process rights under the federal constitution.

### III. Motion to Suppress Confessions

### A. Facts relating to confessions

¶14 Eggers next contends the trial court erred in denying his motion to suppress his confessions to the detectives. He argues that both confessions were inadmissible because detectives did not give him *Miranda* warnings prior to questioning him and because the confessions were involuntary. We review the denial of a motion to suppress evidence for an abuse of discretion. *State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 306-07 (App. 2000). We consider only the evidence presented at the hearing on the motion, viewing it in the light most favorable to upholding the court's decision. *Id.* ¶ 2. We review the trial court's factual findings for an abuse of discretion and review de novo its legal conclusions. *Id.* ¶ 9.

¶15 The facts surrounding Eggers's confessions generally are not disputed. Shortly after 1:15 p.m. on December 10, 2003, Sergeant Morales was sent from the Eggerses' residence to Douglas High School to speak with Eggers. Morales questioned Eggers for approximately ten minutes in the principal's office with the principal and Lieutenant Tomlinson present. Morales then asked Eggers if he would accompany him to the house,

9

and Eggers agreed. Eggers was not told that he had to go with Morales, nor was he handcuffed when he was placed in the back seat of Morales's vehicle.

¶16      When they arrived at the residence, Eggers remained in the back seat of Morales's vehicle while deputies searched the house. The other children were also sitting in patrol vehicles during the search. When Eggers needed to use the restroom, Morales escorted him to some bushes, waited, and escorted him back to the vehicle and closed the door. By 5:00 p.m., it was getting dark, so the deputies secured the residence to resume the search the following day. The deputies took Eggers, Joshua, and Michele separately to the substation for additional questioning and kept them apart at the station. Eggers waited in Morales's office prior to his interview.

¶17      Michele was the first to be interviewed, followed by Joshua, and then Eggers who was interviewed by Detectives Gerencser and Ritchie at 7:51 p.m. with Bradley Jr. present. Prior to being questioned, Eggers was not read his *Miranda* rights. He was not placed under arrest or told that he was free to leave. As they did with Joshua and Michele, the detectives began Eggers's interview with general questions about where Bradley and Delyn Eggers might be and about Eggers's activities the previous few days. The detectives also photographed some scratches on his arms and torso. Sometime during the interview, the detectives left the room to discuss what to ask Eggers next. When they returned, they immediately confronted Eggers with the evidence that had been found in his room.

**¶18** The detectives pointed out inconsistencies in Eggers's answers and accused him of lying. While detectives were questioning him about the individual pieces of evidence, Bradley Jr. commented to Eggers, "But you have it and they're gone. Pretty . . . incriminating if you don't tell 'em what's going on. They're gonna arrest you." Detective Ritchie then started to question Eggers about the keys to his parents' truck, but before she finished the question, Eggers stated, "Cause I shot them." The detectives immediately ended the interview at 8:26 p.m. The interview resumed at 8:27 p.m., and Eggers was read his *Miranda* rights. Eggers acknowledged he understood his rights, but he did not expressly waive them. However, he readily answered the detectives' questions and gave a very detailed confession. The interview concluded at 9:24 p.m.

**¶19** The trial court denied Eggers's motion to suppress his confessions after finding: (1) he was not in custody for purposes of *Miranda*; (2) *Miranda* did not apply to Eggers's first inculpatory statement because it was made in response to Bradley Jr.'s statement and was "freely volunteered" in the presence of law enforcement officers; (3) the pre-*Miranda* statements did not taint the post-*Miranda* statements; and (4) Eggers's statements were voluntary.

## B. Failure to give *Miranda* warnings

**¶20** Individuals, including juveniles, are not constitutionally entitled to the protection of *Miranda* every time they speak with law enforcement officers. *See State v. Carter*, 145 Ariz. 101, 106, 700 P.2d 488, 493 (1985); *State v. Montes*, 136 Ariz. 491, 493,

11

667 P.2d 191, 193 (1983); *In re Navajo County Juvenile Action No. JV91000058*, 183 Ariz. 204, 205-06, 901 P.2d 1247, 1248-49 (App. 1995). "The triggering event for *Miranda* warnings is custodial interrogation by state law enforcement agents." *Navajo County Juvenile Action No. JV91000058*, 183 Ariz. at 206, 901 P.2d at 1249.

¶21 Whether a person is in custody for purposes of *Miranda* is a mixed question of fact and law, warranting deference to the trial court's factual findings that are supported by the record and de novo review of the court's legal conclusions. *See Thompson v. Keohane*, 516 U.S. 99, 112-13, 116 S. Ct. 457, 465 (1995); *see also State v. Blackmore*, 186 Ariz. 630, 632, 925 P.2d 1347, 1349 (1996). The test for determining whether a suspect is in custody for *Miranda* purposes is an objective one. *Yarborough v. Alvarado*, 541 U.S. 652, 667, 124 S. Ct. 2140, 2151 (2004); *State v. Perea*, 142 Ariz. 352, 354, 690 P.2d 71, 73 (1984). A suspect is in custody if "'under the totality of the circumstances a reasonable person would feel that he was in custody or otherwise deprived of his freedom of action in a significant way.'" *State v. Smith*, 197 Ariz. 333, ¶ 4, 4 P.3d 388, 390 (App. 1999), *quoting Carter*, 145 Ariz. at 105, 700 P.2d at 492; *see also State v. Spreitz*, 190 Ariz. 129, 143, 945 P.2d 1260, 1274 (1997) ("The test used to determine if a person is in custody under a Fifth Amendment analysis is whether the person's freedom of movement is restricted to the extent it would be tantamount to formal arrest.").

¶22 There are four factors that bear on the issue of custody: (1) the presence of objective indicia of arrest, (2) the interrogation site, (3) the length and form of the

interrogation, and (4) the focus of the investigation on the accused if conveyed by word or conduct to the accused.[4]  *See Stansbury v. California*, 511 U.S. 318, 323-25, 114 S. Ct. 1526, 1529-30 (1994); *see also State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991).  These factors apply to juveniles, "'but with additional elements that bear upon a child's perceptions and vulnerability, including the child's age, maturity and experience with law enforcement and the presence of a parent or other supportive adult.'"  *In re Jorge D.*, 202 Ariz. 277, ¶ 15, 43 P.3d 605, 608-09 (App. 2002), *quoting State v. Doe*, 948 P.2d 166, 173 (Idaho Ct. App. 1997).  *But see Alvarado*, 541 U.S. at 666, 124 S. Ct. at 2151 ("Our opinions applying the *Miranda* custody test have not mentioned the suspect's age, much less mandated its consideration.").

---

[4]We acknowledge that "the focus of the investigation on the accused" is not sufficient standing alone to constitute a factor for determining the issue of custody.  *See State v. Wright*, 161 Ariz. 394, 397, 778 P.2d 1290, 1293 (App. 1989) ("*Miranda* warnings are not required merely because the questioned person is one whom the police suspect.").  However, in *Stansbury v. California*, 511 U.S. 318, 325, 114 S. Ct. 1526, 1530 (1994), the Supreme Court concluded

> an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

 The Court also stated, "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Id.; see also State v. Buchanan*, 543 S.E.2d 823, 829 (N.C. 2001).

¶23 Eggers contends he was in custody from the moment he was placed into the back of Morales's vehicle at the high school. We disagree. "The voluntary accompaniment of an officer from the place of their first encounter to a police station or some other place for further investigation cannot, without more, be considered an arrest." *State v. Clemons*, 27 Ariz. App. 193, 196, 552 P.2d 1208, 1211 (1976); *State v. Navarro*, 201 Ariz. 292, ¶ 18, 34 P.3d 971, 976 (App. 2001). Applying the relevant factors, at that point in the investigation, no sufficient, objective indicia of arrest were present to conclude Eggers was in custody for *Miranda* purposes. The only questioning had occurred at the high school and lasted for ten minutes. It was not confrontational and sought information that might help locate Eggers's parents. Eggers had voluntarily accompanied Morales to the residence in Morales's vehicle, and he had not been handcuffed or told he was not free to leave. Furthermore, because the evidence had not yet been discovered in Eggers's closet, the deputies had no way of knowing what, if any, crime had been committed. Therefore, it cannot reasonably be said that Eggers had become the focus of the investigation, so that message could not have been conveyed to Eggers by the officers. *See Perea*, 142 Ariz. at 355, 690 P.2d at 74; *see also Stansbury*, 511 U.S. at 325, 114 S. Ct. at 1530. Because no other indicia of custody were present, Eggers was not in custody at that point.

¶24 That changed, however, as the investigation progressed. *See Thompson*, 516 U.S. at 112, 116 S. Ct. at 465 (custody inquiry focuses on particular "circumstances surrounding the interrogation"). Although he still had not been handcuffed or told he was

14

not free to leave after arriving at the residence, Eggers was physically confined to the back seat of a police vehicle and remained exclusively in an officer's presence for an extended period of time. He was also accompanied outside the car by an officer when he needed to relieve himself.

¶25 Thereafter, Eggers was transported to the sheriff's substation in the back of a police vehicle after having been confined to the car for at least two hours except for the few minutes when he was escorted to the bushes. From the moment Morales first made contact with him to the time he confessed more than six hours later, Eggers was not out of an officer's sight or physical control except for a minute or two when Morales left Eggers in his office to get him some water. He was also questioned for thirty-five minutes at the substation in a way that communicated to him that he was a suspect in his parents' disappearance, as the state conceded at oral argument. After the evidence had been discovered in Eggers's closet, and prior to his confession, the nature of the investigation changed from general to one that focused on Eggers. The second round of questioning took place at the substation, rather than a school principal's office, and, unlike the earlier interview, it became highly confrontational. Eggers was never told he could leave and was left alone for only one or two minutes. *See Alvarado*, 541 U.S. at 665, 124 S. Ct. at 2150 (noting as factors suggesting defendant was in custody that interview was at police station, interview lasted two hours, and defendant not told he was free to leave).

15

¶26       From the detectives' interviews with Eggers, Michele, and Joshua, it is apparent that prior to Eggers's interrogation, the investigation had focused on him, and that suspicion was conveyed to Eggers during his interrogation. Although the detectives questioned all three children generally about the parents' schedule and recent activities, a substantial portion of their questions of all three focused on Eggers.[5] And Eggers's own interview focused substantially more on his activities and whereabouts the previous two days than on his parents'. During the initial part of the interview, the detectives probed inconsistencies in his statements and how he knew his parents were not home when he brought his friends over in the middle of the night. They questioned him about his underage drinking and illegal drug use and photographed the scratches on his arms and back. And, after the first break in the interrogation, they confronted Eggers with the objects found in his closet, clearly told him they did not believe him, and suggested he knew where his parents were. At that point, as the state acknowledged at oral argument in this court, the detectives questioned Eggers in a confrontational and accusatory manner, which communicated to him that he was the focus of the investigation.

---

[5]During their interviews, the detectives asked Michele and Joshua about Eggers's friends, drug habits, and whether he had recently fought with or ever physically threatened his parents. However, they did not ask similar questions about Joshua or Michele. Specifically, they asked Joshua whether he would keep Eggers's secrets, if he thought Eggers had done something wrong, if Eggers had threatened him, and whether he had ever seen Eggers with weapons. They also asked Joshua if Eggers had been behaving "differently" since his parents disappeared, and when Joshua said Eggers had invited someone over when his parents would not have allowed him to do so, Detective Gerencser suggested that Eggers would not have done so unless he knew his parents were not coming back.

16

¶27 Although Detective Gerencser testified at the suppression hearing that Eggers was not a suspect prior to his confessing and that Gerencser was "shocked" when Eggers first confessed, these assertions were contradicted by his testimony at trial.[6] Gerencser admitted at trial to having been "suspicious" of Eggers and "that some . . . foul play may have occurred" before he interviewed Eggers. Furthermore, at the suppression hearing, Detective Ritchie testified that they waited to tell Eggers they had found evidence in his room because "[m]aybe he would tell us where his parents were—what happened to his parents."

¶28 Despite the state's assertion on appeal that the investigation was a "broad[] investigation to determine what, if anything, had happened to [the] parents," taking into account the totality of the circumstances, we conclude Eggers was in custody for purposes of *Miranda* at the time of his interview at the substation. Because the trial court's contrary

---

[6]Citing Arizona's well-established general rule that we may only consider evidence presented at the suppression hearing in addressing a trial court's pretrial ruling on a motion to suppress, *see State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996), the state contends we should not consider Detective Gerencser's trial testimony. Because that testimony directly contradicted his prior testimony at the suppression hearing on a point directly relevant to the merits of the motion, and because Eggers alerted the trial court to that fact and renewed his motion to suppress on that basis during trial, we exercise our discretion under these particular circumstances in considering this limited portion of Gerencser's trial testimony. *Cf. State v. Farley*, 452 S.E.2d 50, 57 n.7 (W. Va. 1994) ("[W]here there is a change in circumstances, the trial court has discretion to reconsider a pretrial ruling on a motion to suppress."), *citing Thompson v. Steptoe*, 366 S.E.2d 647, 649 (W. Va. 1988); *see also State v. Strayhand*, 184 Ariz. 571, 596, 911 P.2d 577, 602 (App. 1995) (McGregor, J., concurring in part and dissenting in part). In so doing, however, we do not purport to comprehensively address what other circumstances, if any, would possibly justify deviating from the general rule that limits what evidence may be considered in reviewing a trial court's ruling on a motion to suppress.

conclusion was not clearly based on resolution of any conflicting facts, weighing of testimony presented at the suppression hearing, or evaluation of witness credibility, but rather, hinged merely on the undisputed facts and the transcript of the interrogation, we do not owe any particular deference to the trial court's custody ruling. *See Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 114, 412 P.2d 47, 51 (1966) ("[I]f the facts are undisputed, we may ignore the trial court's findings and substitute our own analysis of the record."); *see also Gen. Dynamics Corp. v. Zantop Int'l Airlines*, 147 Ariz. 92, 93, 708 P.2d 773, 774 (App. 1985). Given the entire chain of events and all the surrounding circumstances, a reasonable person would have felt as though his freedom of movement was significantly restricted, tantamount to formal arrest. *See State v. Spreitz*, 190 Ariz. 129, 143, 945 P.2d 1260, 1274 (1997); *Jorge D.*, 202 Ariz. 277, ¶¶ 15-16, 43 P.3d at 608-09.

## C. State action

¶29        The trial court found that Eggers's initial confession was not the product of state action but, instead, was "in response to a question posed to [him] by his older adult brother, a third party." Although Eggers was in custody, if his statement was not the product of questioning by law enforcement agents, *Miranda* would not require its suppression. *See State v. Sharp*, 193 Ariz. 414, 421, 973 P.2d 1171, 1178 (1999) ("Fulfilling the state action requirement is essential because the protections contemplated by the Fourteenth Amendment, and by incorporation of the Fifth Amendment, apply only to state actors, not to private parties."); *see also Navajo County No. JV91000058*, 183 Ariz. at 206, 901 P.2d

18

at 1249. The Supreme Court has broadly defined interrogation as "not only . . . express questioning, but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-90 (1980); *see also Montes*, 136 Ariz. at 493-94, 667 P.2d at 193-94. Eggers argues that he confessed in response to the questioning by law enforcement officers, not to Bradley Jr.'s "interject[ion]," and in any event, that Bradley Jr. was an instrument of the detectives and his statement should therefore be attributed to them.

¶30 Eggers's argument has merit. The detectives had, prior to Eggers's interview, expressly enlisted Bradley Jr.'s assistance in interviewing Joshua. Particularly telling is testimony that, when the detectives announced that they had concluded their interview of Joshua, Detective Gerencser deliberately left the tape recorder on. He told Bradley Jr. the tape recorder would be left on while he and Joshua were left alone in the room, and he asked Bradley Jr. to see if he could get Joshua to tell him what was going on. And it is apparent that the detectives had focused on the evidence found in Eggers's closet because they had told Bradley Jr. about it. Bradley Jr. told Joshua that the detectives "seem to think that Zach may have had a hand in something. . . . [T]hey found some, mom's purse, mom's, dad's wallet and the shotgun in Zach's closet." Bradley Jr. urged Joshua not to "cover for [Zachary] no matter what's going on."

19

¶31 At the suppression hearing, the detectives' testimony concerning Eggers's interrogation was the only substantive evidence considered, other than the actual transcript of the interview, on whose statements prompted Eggers's confession. Neither Detective Gerencser nor Detective Ritchie testified that, having been present at the interview, they believed Eggers's initial confession had been in response to what Bradley Jr. said. Although both detectives testified that Eggers's confession "immediately" followed Bradley Jr.'s statement, both acknowledged that Ritchie made an intervening comment about the truck keys. This is not disputed by the defense and is not contradicted by the interview transcript. Even assuming Bradley Jr. was not an "instrumentality" of the detectives, the detectives' testimony does not resolve the issue of to whom Eggers was responding when he confessed; it merely confirms the order in which things were said.

¶32 Furthermore, the trial court adopted both parties' proposed findings of fact, including the state's proposed finding that Eggers's "initial confession was prompted, at least in part, by the confrontational nature of the statement made by his older brother." However, this finding referred exclusively to the transcript of Eggers's interrogation, not to any testimony presented at the suppression hearing, and the trial court's own finding in its minute entry does not reflect any reliance on suppression hearing testimony. Therefore, we are not bound by the trial court's finding regarding which statement or statements prompted Eggers's confession, *see Tovrea*, 100 Ariz. at 114, 412 P.2d at 51; *General Dynamics*, 147 Ariz. at 93, 708 P.2d at 774, nor do we find its conclusion supported by the transcript itself.

20

¶33     Immediately after the detectives returned from conferring about how to proceed, they confronted Eggers with the evidence found in his closet.  When Eggers did not answer their questions to their satisfaction, the following exchange took place:

> **[Detective Gerencser]:**  We can sit here and listen to you lie forever if you want.  You think we gonna believe this crap you're telling us?
>
> . . . .
>
> **[Detective Gerencser]:**  You know they weren't there, that's why you brought your friends there.  Right?  So, where are they?
>
> **[Eggers]:**  I don't know.
>
> **[Detective Gerencser]:**  Why do you have your Mom's purse?
>
> **[Eggers]:**  I don't know.
>
> **[Detective Gerencser]:**  Well, these are things that your parents don't do.  They don't allow you to have this stuff, correct?
>
> **[Eggers]:**  Yeah.
>
> **[Bradley Jr]:**  But you have it and they're gone.  Pretty . . . incriminating if you don't tell 'em what's going on.  They're gonna arrest you.
>
> **[Detective Ritchie]:**  Including their keys to the truck in your, ahem, . . .
>
> **[Eggers]:**  Cause I shot them.

21

¶34     As Eggers's counsel pointed out at oral argument in this court, Eggers's statement was actually not responsive to Bradley Jr. The last full, unanswered question had been asked by Detective Gerencser when he asked why Delyn Eggers's purse was in Eggers's room. The subsequent comments by both detectives and Bradley Jr. only add details to the overarching question of why Eggers's parents' belongings were in his closet. Thus, while it is true that Bradley Jr.'s comment preceded Eggers's confession, it is also true that Detective Ritchie's comment did as well. On this record, we cannot agree with the trial court that Eggers's statement was made in response to his brother's comment rather than the confrontational interrogation taking place around it. And, as we have determined, under the circumstances, the detectives should have given Eggers *Miranda* warnings prior to questioning him at the substation. Certainly, once the detectives confronted Eggers with the evidence and accused him of lying after stopping the interview to strategize on their course of action, they should have known their questions were reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301, 100 S. Ct. at 1689-90; *see also Montes*, 136 Ariz. at 493-94, 667 P.2d at 193-94.

¶35     The content and confrontational nature of Eggers's interview went beyond investigatory efforts to simply find out where his parents might be. It was the type of police conduct and questioning "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301, 100 S. Ct. at 1689. On this basis, we conclude the evidence does not support the trial court's finding that Eggers's initial confession was not the result of a custodial interrogation.

22

*See State v. Rosengren*, 199 Ariz. 112, ¶ 9, 14 P.3d 303, 307 (App. 2000) (reviewing court defers to trial court's findings of fact if reasonable evidence supports them). Therefore, the trial court erred in admitting Eggers's initial confession.

**D. Eggers's second confession**

¶36　　　　Although the trial court ruled that Eggers "was not in custody for purposes of *Miranda*" and had voluntarily confessed both before and after receiving and validly waiving his *Miranda* rights, the court also concluded Eggers's "post-*Miranda* statements were not tainted by or as a result of his pre-*Miranda* statements." Eggers contends his second confession, obtained after he was informed of his *Miranda* rights, should also have been excluded at trial because it was obtained in violation of the Supreme Court's holding in *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004). The state did not address this issue.

¶37　　　　Prior to *Seibert*, successive unwarned and warned confessions were governed by *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285 (1985). There, the Court held that an initial unwarned inculpatory statement made while in police custody does not render a subsequent warned confession inadmissible if both statements were made voluntarily. *Id.* at 314, 105 S. Ct. at 1296. However, in *Seibert*, a four-justice plurality held that *Miranda* warnings given mid-interrogation, after an inculpatory statement had already been obtained, were ineffective to protect the purposes *Miranda* was designed to serve, and the confession repeated after the warnings was inadmissible. 542 U.S. at 616-17, 124 S. Ct. at 2612-13.

23

Justice Kennedy, concurring in the judgment, would have restricted the holding to narrower grounds, finding that unless, as was the case in *Seibert*, the police specifically employ an interrogation process intentionally designed to undermine *Miranda, Elstad* should continue to govern post-warning statements. 542 U.S. at 618-22, 124 S. Ct. at 2614-16 (Kennedy, J., concurring). In reaching a different result from *Elstad*, the Court relied heavily on *Seibert*'s distinguishable facts. 542 U.S. at 615-16, 124 S. Ct. at 2612-13.

¶38 In *Elstad*, the defendant was arrested in his home but was not immediately warned. 470 U.S. at 300-01, 105 S. Ct. at 1288-89. While one of the officers spoke with Elstad's mother, the other officer asked Elstad if he knew why the officers were there. *Id*. When he stated he did not, the officer told him, and Elstad subsequently made an inculpatory statement. *Id*. He was then transported to the police station, where he waited for approximately an hour and received *Miranda* warnings prior to the resumption of questioning. 470 U.S. at 301, 105 S. Ct. at 1289.

¶39 In *Seibert*, the defendant was arrested, taken to the police station, and purposely interrogated for thirty to forty minutes without being given any warnings. 542 U.S. at 604-05, 124 S. Ct. at 2606. During that time, she confessed, and after a twenty-minute coffee break, she was warned and the officer obtained her confession again. *Id*. at 605, 124 S. Ct. at 2606. In holding Seibert's warned confession inadmissible, the plurality distinguished the case before it from *Elstad* based on whether, in these circumstances, "the

24

warnings could function 'effectively' as *Miranda* requires." 542 U.S. at 611-12, 124 S. Ct. at 2610. Distinguishing the facts from those in *Elstad*, the plurality noted that

> a series of relevant facts . . . bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

542 U.S. at 615, 124 S. Ct. at 2612.

¶40 Comparing the two cases, the plurality in *Seibert* discussed how, in *Elstad*, the lapse in time and change in location between the statements was sufficient to create a "new and distinct experience" in which the defendant could exercise "a genuine choice whether to follow up on the earlier admission." 542 U.S. at 615-16, 124 S. Ct. at 2612. The Court characterized the initial statement in *Elstad* as the result of a "good-faith *Miranda* mistake." 542 U.S. at 615, 124 S. Ct. at 2612. In contrast, *Seibert* contained no real lapse in time or change in location, and unlike *Elstad*, the unwarned questioning was "systematic, exhaustive, and managed with psychological skill." 542 U.S. at 616, 124 S. Ct. at 2612. In *Seibert*, the officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" 542 U.S. at 605-06, 124 S. Ct. at 2606. Furthermore, *Seibert*'s post-*Miranda* interrogation was conducted with reference to the unwarned

confession. 542 U.S. at 605, 124 S. Ct. at 2606. The plurality concluded the facts in the two cases were in sharp contrast, and those in *Seibert* "by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings." 542 U.S. at 616, 124 S. Ct. at 2612.

¶41 Generally, the holding of a plurality opinion is only that of the narrowest grounds on which the concurring justices agree. *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977). But deciphering *Seibert*'s meaning is difficult. Although Arizona has yet to apply *Seibert* to these two-stage (unwarned, then warned) confessions, other jurisdictions have done so. Some have adhered to Justice Kennedy's apparent reliance on the subjective intent of the officers. *See United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007); *United States v. Briones*, 390 F.3d 610, 613-14 (8th Cir. 2004). Others have adopted a totality-of-the-circumstances approach that examines both the subjective intent of the police, which was the focus of Justice Kennedy's approach, and the objective factors outlined in the plurality opinion to determine the admissibility of the post-warning statements. *See, e.g., United States v. Williams*, 435 F.3d 1148, 1160 (9th Cir. 2006); *State v. Brown*, 912 A.2d 525, 529 (Conn. App. Ct. 2006).

¶42 Because, as this case bears out, the intent of the officer may be difficult, if not impossible, to determine in many cases, we decline to focus exclusively on that factor. *See Seibert*, 542 U.S. at 616 n.6, 124 S. Ct. at 2612 n.6. Instead, we agree with the jurisdictions

26

that have adopted *Seibert*'s multifactor analysis. *See id.* at 615, 124 S. Ct. at 2612. As noted above, these factors include:

> (1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken.

*Williams*, 435 F.3d at 1160.

¶43 In the present case, we have an unwarned confession that was the product of a custodial interrogation. Detectives Ritchie and Gerencser paused the initial interrogation to determine how best to get information from Eggers. When they returned, they confronted Eggers with the evidence found in his closet and the inconsistencies in his statements, but they did not, at that time, inform him of his *Miranda* rights. A few minutes later, at 8:26 p.m., Eggers confessed to having shot his parents. Ritchie and Gerencser testified they were "shocked" when Eggers confessed, so Gerencser stopped the interview to give Eggers *Miranda* warnings and "collect [his] thoughts." The interrogation resumed only one minute later, however, and the detectives conducting the questioning did not change. After reading the warnings, Gerencser stated: "[Y]ou want to start from the beginning." Although the second confession was significantly more detailed than the first, once Eggers had admitted having shot his parents, there was little left for him to say that would further incriminate him.

**¶44** The detectives took no curative measures other than to recite *Miranda* warnings. They did not tell Eggers the prior statement would not be used against him or do anything "to dispel the oddity of warning about legal rights to silence and counsel" after the detectives had already elicited an inculpatory statement. *Seibert*, 542 U.S. at 616, 124 S. Ct. at 2613. Instead, the detectives treated the post-*Miranda* questioning as a continuation of the first by merely suggesting that Eggers "start from the beginning." Thus, "any uncertainty

. . . about a right to stop talking about matters previously discussed would only have been aggravated" by the detective's clear reference to Eggers's initial admission, and it would have been reasonable for Eggers "to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Seibert*, 542 U.S. at 616-17, 124 S. Ct. at 2613.

**¶45** Therefore, we conclude that the detectives' mere recitation of *Miranda* rights after Eggers had already confessed to shooting his parents did not cure the deficiency created by their failure to warn him initially. The trial court thus abused its discretion in admitting Eggers's second confession.[7]

---

[7]Eggers also contends his confessions were involuntary. "Voluntariness and *Miranda* are two separate inquiries." *State v. Montes*, 136 Ariz. 491, 494, 667 P.2d 191, 194 (1983). "Preclusion of evidence obtained in violation of *Miranda* is based on the Fifth Amendment privilege against self-incrimination. Preclusion of involuntary confessions is based on the Due Process Clause of the Fourteenth Amendment and applies to confessions that are the product of coercion or other methods offensive to due process." *In re Jorge D.*, 202 Ariz. 277, ¶ 19, 43 P.3d 605, 609 (App. 2002) (citation omitted). But, because we have

## IV. Harmless Error

**¶46**		"When statements should have been suppressed as violative of *Miranda*, 'the appellate court . . . simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.'" *State v. Rodriguez*, 186 Ariz. 240, 246, 921 P.2d 643, 649 (1996), *quoting Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991); *see also State v. Davolt*, 207 Ariz. 191, ¶ 43, 84 P.3d 456, 470 (2004); *In re Jorge D.*, 202 Ariz. 277, ¶¶ 17-18, 43 P.3d 605, 609 (App. 2002). We need not reverse a criminal conviction if we can say the error is harmless. *See State v. Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d 601, 607 (2005).

**¶47**		Although the erroneous admission of a confession can be harmless, we note that "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Fulminante*, 499 U.S. at 296, 111 S. Ct. at 1257, *quoting Bruton v. United States*, 391 U.S. 123, 139-40, 88 S. Ct. 1620, 1630 (1968) (White, J., dissenting). This is particularly true when the statement is a full and complete confession rather than a statement that only becomes inculpatory when linked with other evidence. *See id.* at 296, 111 S. Ct. at 1258.

---

determined the statements should have been precluded on *Miranda* grounds, we need not decide the issue of voluntariness. And, in any event, even assuming Eggers's confessions were involuntary, we would still apply the same harmless error review. *See State v. Ross*, 180 Ariz. 598, 604, 886 P.2d 1354, 1360 (1994).

¶48　　　　At oral argument, Eggers urged this court not to find the error in this case harmless, claiming the confession was such a damning piece of evidence that this court could not say, beyond a reasonable doubt, that it had no effect on the verdicts. He contends the prosecutor's emphasis on the confession in his closing argument illustrates the importance of the confession to the state's case. *See State v. Fulminante*, 193 Ariz. 485, ¶¶ 50, 54-55, 975 P.2d 75, 90, 91 (1999) (given state's "thin case for murder," prosecutor's emphasis of improperly admitted evidence during closing argument contributed to finding of reversible error).

¶49　　　　That the prosecutor understandably stressed in closing argument Eggers's confession, however, does not necessarily negate a finding of harmless error. It is true that courts have repeatedly and consistently said "[e]rror is harmless if the reviewing court can say, beyond a reasonable doubt, that it did not contribute to or affect the verdict." *State v. Poyson*, 198 Ariz. 70, ¶ 21, 7 P.3d 79, 86 (2000); *see also Fulminante*, 499 U.S. at 295-96, 111 S. Ct. at 1257; *Davolt*, 207 Ariz. 191, ¶ 39, 84 P.3d at 470. However, if the court can say, beyond a reasonable doubt, that the verdict would have been the same without the inadmissible evidence, the erroneously admitted evidence cannot be said to have contributed to the verdict. *Davolt*, 207 Ariz. 191, ¶ 43, 84 P.3d at 470. Thus, to determine whether the error was harmless, "we must look to the impact of the inadmissible statements in light of the totality of properly admitted evidence." *Fulminante*, 193 Ariz. 485, ¶ 50, 975 P.2d at

30

90; *see also Davolt*, 207 Ariz. 191, ¶¶ 39-43, 84 P.3d at 470; *State v. Ross*, 180 Ariz. 598, 604, 886 P.2d 1354, 1360 (1994).

¶50    Aside from Eggers's confession, the evidence in this case was largely circumstantial but was nonetheless highly probative of guilt. "There is no distinction in the probative value of direct and circumstantial evidence. A conviction may be sustained on circumstantial evidence alone." *State v. Green*, 111 Ariz. 444, 446, 532 P.2d 506, 508 (1975); *see also Davolt*, 207 Ariz. 191, ¶ 43, 84 P.3d at 470 (probative weight of circumstantial evidence "sufficient to justify the verdict[]" and uphold conviction on harmless error analysis).

¶51    Eggers's mother's purse and his father's wallet were found in Eggers's closet. During their search of the property the day after Eggers's arrest, deputies discovered the parents' bodies where they had been buried in shallow graves.[8] Delyn Eggers died from a

---

[8]The trial court expressly found that, separate and apart from Eggers's confession, "[t]he physical evidence and the bodies would have inevitably been discovered by lawful means." Eggers neither challenges that ruling nor argues that evidence of his parents' bodies should have been excluded. However, even assuming he had, it was still admissible under the doctrine of inevitable discovery. *See State v. Castaneda*, 150 Ariz. 382, 387, 724 P.2d 1, 6 (1986) (evidence of location of victim's body admissible despite coercion in obtaining location because it would have been discovered at first light). At the time Eggers confessed, a search warrant for the Eggerses' property had been obtained, and the scene had been secured for the night by the Arizona Rangers. Furthermore, cadaver dogs would have been brought to search the property if the Eggerses could not be located. Therefore, the bodies would lawfully have been discovered without Eggers's confession, and evidence about them was properly admitted. *See State v. Davolt*, 207 Ariz. 191 ¶ 38, 84 P.3d 456, 469 (2004); *Castaneda*, 150 Ariz. at 387, 724 P.2d at 6; *see also United States v. Patane*, 542 U.S. 630, 633-34, 124 S. Ct. 2620, 2624 (2004) (officers' failure to give suspect *Miranda* warnings does not require "suppression of the physical fruits of the suspect's unwarned but voluntary

single shotgun blast to the face, and Bradley Eggers died from shotgun wounds to the abdomen and chest. The shotgun used to kill his parents was also found in Eggers's closet with his fingerprint on it. The state elicited testimony that Eggers was not allowed to have the gun unless his parents were present. Two witnesses testified that Eggers had told them he hated his mother and father. And another witness testified that Eggers had "loosely" commented he was so mad he could kill his parents. Yet another witness testified Eggers had said he wanted to know what it felt like to kill someone, but she had not taken him seriously.

¶52        The evidence of Eggers's behavior during his parents' disappearance is particularly compelling. Bradley Jr., Joshua, and Michele all testified that the parents would never have permitted Eggers to have friends visit in the middle of the night, and he was never permitted to drive the truck. However, following his parents' disappearance, Eggers brought his friends to the house late at night, and they stayed until the early morning hours. He also told his friends that his parents were out of town. Earlier, he told his boss that his parents had applied for a transfer out of the area. And Eggers did not merely use the truck during his parents' disappearance; he drove it to Agua Prieta, Mexico, where he sold it for approximately $800-$1,000, an amount substantially below its fair market value.

¶53        From Eggers's behavior, the only reasonable inference the jury could draw was that he knew his parents were not home and would not be coming home. The testimony of

statements").

Eggers's relatives and friends about his behavior following his parents' disappearance, combined with the physical evidence, overwhelmingly supports the jury's verdicts. *See Davolt*, 207 Ariz. 191, ¶ 43, 84 P.3d at 470. "Thus, even without [the confessions] that should have been excluded, the verdicts would not have been different. Upon review of the entire record, we conclude, as a matter of law, that the introduction of the [confessions] was harmless beyond a reasonable doubt." *Id.; see also Ross*, 180 Ariz. at 604, 886 P.2d at 1360.

## V. Constitutionality of Juvenile Natural Life Sentences

¶54 Eggers asserts that the trial court's "imposition of a natural life prison term in this case constitutes cruel and unusual punishment."[9] He argues that "[b]ecause a juvenile cannot fully understand the consequences of his actions and cannot fully understand what it means to empathize with others, juveniles simply should not be punished as adults, even for serious crimes." He contends A.R.S. § 13-501 "unfairly exposes juvenile offenders to the maximum penalty available under the law as an adult" and "therefore results in cruel and unusual punishment of juvenile offenders."

¶55 In noncapital cases, the Eighth Amendment prohibits only those punishments that are "'grossly disproportionate'" to the crime committed. *Ewing v. California*, 538 U.S.

[9]Eggers does not argue, and we do not find, a "compelling reason" to interpret article II, § 15 of the Arizona Constitution as prohibiting cruel and unusual punishment differently from the Eighth Amendment. *State v. Davis*, 206 Ariz. 377, ¶ 12, 79 P.3d 64, 67-68 (2003). Therefore, our Eighth Amendment discussion encompasses Eggers's state claim.

11, 23, 123 S. Ct. 1179, 1187 (2003), *quoting Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705 (1991) (Kennedy, J., concurring). Whether a sentence is disproportionate is determined according to a process first articulated in Justice Kennedy's concurring opinion in *Harmelin* and later adopted by the Court in *Ewing*. 538 U.S. at 23-24, 123 S. Ct. at 1187. First, the reviewing court determines whether a "threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707 (Kennedy, J., concurring). Then, if such an inference arises, it is tested through comparing that state's punishment scheme for other crimes and the sentences imposed in other states for the same crime. *Id*.

¶56 "[O]nly in 'exceedingly rare' cases will a sentence to a term of years violate the Eighth Amendment's prohibition on cruel and unusual punishment." *State v. Berger*, 212 Ariz. 473, ¶ 17, 134 P.3d 378, 382 (2006), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1370 (2007), *quoting Ewing*, 538 U.S. at 22, 123 S. Ct. at 1186. That a natural life prison sentence is not disproportionate for an adult who commits first-degree murder is beyond dispute. *See State v. Parle*, 110 Ariz. 517, 521, 521 P.2d 604, 608 (1974). The issue here, then, is whether such a sentence is disproportionate for juveniles because of their less culpable nature.

¶57 In considering whether the sentences imposed in this case are grossly disproportionate to the gravity of the offenses, we "must accord substantial deference to the

34

legislature and its policy judgments." *Berger*, 212 Ariz. 473, ¶ 13, 134 P.3d at 381.  Four basic principles guide a court's threshold evaluation of proportionality.  *Ewing*, 538 U.S. at 23, 123 S. Ct. at 1186.  These include "'the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors.'"  *Id., quoting Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705 (Kennedy, J., concurring).

**¶58**      Our first step is to determine whether the legislature had a reasonable basis to believe that its sentencing scheme substantially furthers the goals of its criminal justice system.  *See Ewing*, 538 U.S. at 28, 123 S. Ct. at 1189; *Berger*, 212 Ariz. 473, ¶ 17, 134 P.3d at 382.  Section 13-501 was enacted to implement the constitutional amendment expressly authorizing more severe treatment of juvenile offenders.  *See In re Cameron T.*, 190 Ariz. 456, 459, 949 P.2d. 545, 548 (App. 1997) ("The overall intent of [the initiative] was to make possible faster, more effective, and in some cases more stringent responses to juvenile crime.").  And "[t]he effect of the constitutional amendment and legislation was to subject older juvenile offenders accused of violent crimes to the adult criminal system, unless specifically excepted."  *State v. Oaks*, 209 Ariz. 432, ¶ 13, 104 P.3d 163, 166 (App. 2004).  Although the initiative did not explicitly address sentences for juveniles tried as adults, it was quite clear that "[u]pon conviction all such juveniles shall be subject to the same laws as adults."  Ariz. Const. art. IV, pt. 2, § 22(1).  And it is equally clear that the

35

amendment intended certain juveniles to be punished as adults. It cannot be said that the legislature, in giving effect to that intent, acted unreasonably.

¶59 Eggers nonetheless contends the statute subjects juveniles, who are less culpable than adults, to the "maximum penalty" and constitutes cruel and unusual punishment. His argument stems from the Court's acknowledgment in *Roper v. Simmons*, 543 U.S. 551, 572-73, 125 S. Ct. 1183, 1197 (2005), and other cases that juveniles are inherently less morally culpable than adults. As we have said: "Although we agree . . . that being prosecuted as an adult potentially involves 'more severe consequences,' we do not agree that the mere exposure to adult prosecution constitutes 'enhanced punishment.'" *State v. Rodriguez*, 205 Ariz. 392, ¶ 26, 71 P.3d 919, 926 (App. 2003). "'The . . . statute does not *per se* increase punishment; it merely establishes "a basis for . . . [adult] court jurisdiction of prosecutions to which it applies."'" *Id., quoting United States v. Juvenile*, 228 F.3d 987, 990 (9th Cir. 2000), *quoting United States v. David H.*, 29 F.3d 489, 491 (9th Cir. 1994).

¶60 In *Simmons*, the Court found that juveniles' "insufficient culpability" rendered capital punishment cruel and unusual when applied to them. 543 U.S. at 572-73, 125 S. Ct. at 1196-97. This conclusion was based on the Court's determination that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Id*. at 568, 125 S. Ct. at 1194, *quoting Atkins v. Virginia*, 536 U.S. 304, 319,

36

122 S. Ct. 2242, 2251 (2002). And, because the "susceptibility of juveniles to immature and irresponsible behavior" lessens their culpability and means that they "cannot with reliability be classified among the worst offenders," they cannot constitutionally be subject to the death penalty. *Id*. at 569, 570, 125 S. Ct. at 1195. However, it does not necessarily follow that this lesser culpability also means juveniles cannot be classified among those offenders deserving of natural life sentences.

¶61        Sentences for terms of years are analytically distinct from capital punishment. *See Harmelin*, 501 U.S. at 1000-01, 111 S. Ct. at 2704-05 (Kennedy, J., concurring); *Solem v. Helm*, 463 U.S. 277, 294, 103 S. Ct. 3001, 3012 (1983); *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 1138 (1980). In this case, we are dealing with natural life sentences imposed on a juvenile, tried as an adult, who has been convicted of first-degree murder. As noted above, this is undoubtedly a severe sentence for a juvenile, but first-degree murder is an equally serious crime. The Constitution does not prohibit severe sentences; it prohibits only "grossly disproportionate" sentences. *Harmelin*, 501 U.S. at 1001, 111 S. Ct. at 2705 (Kennedy, J., concurring). We cannot say that a natural life sentence is grossly disproportionate to the crime of first-degree murder, even when committed by a juvenile.

## VI. Evolving Standards of Decency

¶62        Eggers nevertheless argues that because he is a juvenile, with less culpability than an adult in his position, a sentence of life in prison without the possibility of parole

violates evolving standards of decency as "outlined" in *Simmons*. As he points out, to determine evolving standards of decency, a court reviews "objective indicia of society's standards" to identify whether there exists a national consensus regarding a particular mode of punishment. 543 U.S. at 563, 125 S. Ct. at 1191. First, this argument is not properly before this court because Eggers raised it for the first time in his reply brief. *See State v. Shipman*, 208 Ariz. 474, n.2, 94 P.3d 1169, 1170 n.2 (App. 2004). And, even assuming he has not waived the argument, we would still not address it. The argument essentially requires a comparison of how other states address the same issue to determine whether there is a national consensus on the matter. This constitutes an interjurisdictional analysis that we do not conduct unless we have first found an inference of gross disproportionality, which we have expressly not found. *See Harmelin*, 501 U.S. at 1005, 111 S. Ct. at 2707 (Kennedy, J., concurring). Thus, we confirm the constitutionality of natural life sentences for juveniles convicted of first-degree murder.

**¶63**      For the foregoing reasons, we affirm Eggers's convictions and sentences.

_____
GARYE L. VÁSQUEZ, Judge

CONCURRING:

_____

JOHN PELANDER, Chief Judge

_____
JOSEPH W. HOWARD, Presiding Judge